# EXHIBIT 1

# Supreme Court of Pennsylvania
## Court of Common Pleas
## Civil Cover Sheet

WASHINGTON _____ County

**For Prothonotary Use Only:**

Docket No: 2017-4761

FILED
SEP 12 2017
J.S. RANKO
PROTHONOTARY

*The information collected on this form is used solely for court administration purposes. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.*

**SECTION A**

**Commencement of Action:**
- [X] Complaint
- [ ] Writ of Summons
- [ ] Petition
- [ ] Transfer from Another Jurisdiction
- [ ] Declaration of Taking

| Lead Plaintiff's Name: | Lead Defendant's Name: |
|---|---|
| Cecyle Klaphake | Columbia Gas Transmission |

**Are money damages requested?** [ ] Yes  [ ] No

**Dollar Amount Requested:** (check one)  [ ] within arbitration limits  [ ] outside arbitration limits

**Is this a Class Action Suit?** [ ] Yes  [X] No

**Is this an MDJ Appeal?** [ ] Yes  [X] No

Name of Plaintiff/Appellant's Attorney: Steven E. Gibbs

[ ] **Check here if you have no attorney (are a Self-Represented [Pro Se] Litigant)**

**SECTION B**

**Nature of the Case:** Place an "X" to the left of the **ONE** case category that most accurately describes your **PRIMARY CASE.** If you are making more than one type of claim, check the one that you consider most important.

**TORT** (do not include Mass Tort)
- [ ] Intentional
- [ ] Malicious Prosecution
- [ ] Motor Vehicle
- [ ] Nuisance
- [ ] Premises Liability
- [ ] Product Liability (does not include mass tort)
- [ ] Slander/Libel/ Defamation
- [ ] Other: _____

**MASS TORT**
- [ ] Asbestos
- [ ] Tobacco
- [ ] Toxic Tort - DES
- [ ] Toxic Tort - Implant
- [ ] Toxic Waste
- [ ] Other: _____

**PROFESSIONAL LIABLITY**
- [ ] Dental
- [ ] Legal
- [ ] Medical
- [ ] Other Professional: _____

**CONTRACT** (do not include Judgments)
- [ ] Buyer Plaintiff
- [ ] Debt Collection: Credit Card
- [ ] Debt Collection: Other

- [ ] Employment Dispute: Discrimination
- [ ] Employment Dispute: Other

- [ ] Other: _____

**REAL PROPERTY**
- [ ] Ejectment
- [ ] Eminent Domain/Condemnation
- [ ] Ground Rent
- [ ] Landlord/Tenant Dispute
- [ ] Mortgage Foreclosure: Residential
- [ ] Mortgage Foreclosure: Commercial
- [ ] Partition
- [ ] Quiet Title
- [ ] Other: _____

**CIVIL APPEALS**
Administrative Agencies
- [ ] Board of Assessment
- [ ] Board of Elections
- [ ] Dept. of Transportation
- [ ] Statutory Appeal: Other
- _____
- [ ] Zoning Board
- [ ] Other: _____

**MISCELLANEOUS**
- [ ] Common Law/Statutory Arbitration
- [X] Declaratory Judgment
- [ ] Mandamus
- [ ] Non-Domestic Relations Restraining Order
- [ ] Quo Warranto
- [ ] Replevin
- [ ] Other: _____

*Updated 1/1/2011*

## IN THE COURT OF COMMON PLEAS OF WASHINGTON COUNTY, PENNSYLVANIA

| | |
|---|---|
| CECYLE KLAPHAKE,<br><br>    Plaintiff,<br><br>v.<br><br>COLUMBIA GAS TRANSMISSION, LLC;<br>COLUMBIA PIPELINE GROUP;<br>and<br>TRANSCANADA CORPORATION,<br><br>    Defendants.<br><br><br>**JURY TRIAL DEMANDED** | Case No. 2017 4761<br><br>**COMPLAINT IN<br>DECLARATORY JUDGMENT**<br><br>Filed on Behalf of Plaintiff<br><br>Counsel of Record for this Party:<br><br>Steven E. Gibbs, Esquire<br>PA I.D. #314894<br><br>Gibbs LLC<br>500 Grant Street, Suite 2900<br>Pittsburgh, PA 15219<br>Telephone: (412) 515-1473 |

## NOTICE TO DEFEND

You have been sued in Court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the Court your defenses or objections to the claims against you. You are warned that if you fail to do so the case may proceed against you and a judgment may be entered against you by the Court without further notice for any money claimed in the complaint or for any other claim or relief requested by the Plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICES SET FORTH BELOW. THESE OFFICES MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THESE OFFICES MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

Lawyer Referral Service
119 South College Street
Washington, Pennsylvania 15301
724-225-6710

Southwestern Pennsylvania Legal Aid Society
10 West Cherry Avenue
Washington, Pennsylvania 15301
724-225-6170

## IN THE COURT OF COMMON PLEAS OF WASHINGTON COUNTY, PENNSYLVANIA

CECYLE KLAPHAKE,          )
)
    Plaintiff,          )
)
    v.           )
)
COLUMBIA GAS TRANSMISSION, LLC;   )    Case No. _____
COLUMBIA PIPELINE GROUP;       )
and                 )
TRANSCANADA CORPORATION,     )
)
    Defendants.        )
)

## COMPLAINT IN DECLARATORY JUDGMENT

Plaintiff Cecyle Klaphake ("Ms. Klaphake") hereby submits the following Complaint In Declaratory Judgment ("Complaint") and avers as follows.

### I.  INTRODUCTION

1. This action is brought pursuant to the Declaratory Judgments Act, 42 Pa. C.S.A. § 7531, *et seq.*, for the purpose of determining the legal rights and obligations of the parties, and involves a question of general and actual controversy that is ripe for consideration, as appears more fully hereinafter.

### II.  PARTIES AND JURISDICTION

2. Cecyle Klaphake is a citizen and resident of Washington County, Pennsylvania.

3. Columbia Gas Transmission, LLC ("CGT") is a Delaware corporation registered in Pennsylvania, with a place of business located in Canonsburg Borough, Washington County, Pennsylvania.

4. Columbia Pipeline Group is a Texas corporation registered in Pennsylvania. CGT is a wholly-owned subsidiary of Columbia Pipeline Group.

5. TransCanada Corporation ("TransCanada") is a Canadian corporation registered in Pennsylvania. TransCanada acquired CGT and Columbia Pipeline Group in 2016.

6. This Court has original jurisdiction over this declaratory judgment action pursuant to 42 Pa. C.S.A. §§ 931, 7532.

### III.   FACTS

7. Ms. Klaphake owns a residence on approximately 120 acres of property located in Cecil Township in Washington County.

8. Ms. Klaphake has owned and lived on the property for approximately 60 years.

**A. The 1946 Easement**

9. The property (hereafter the "Klaphake Farm") is subject to an easement agreement that was entered into by a prior owner of the Klaphake Farm and The Manufacturers Light and Heat Company in 1946. The easement was recorded in Washington County. (Exhibit 1, hereafter "Easement Agreement")

10. The Manufacturers Light and Heat Company ("Manufacturers") was part of Columbia Gas & Electric Company at the time of the Easement Agreement in 1946.

11. As part of a corporate restructuring, Manufacturers became part of CGT.

12. TransCanada acquired CGT and its parent company, Columbia Pipeline Group, in 2016.

13. The Easement Agreement granted Manufacturers and its successors "the right to lay a 20 inch pipe line, and maintain, operate, repair and remove said lines along a line which has been surveyed for the same over and through" the Klaphake Farm. (Exhibit 1)

14. The Easement Agreement further provided that Manufacturers and its successors could "at any time lay, maintain, operate, repair and remove a second line of pipe alongside of the first line as herein provided, upon the payment of a like consideration and subject to the same considerations; also may change the site of its pipes, the damages, if any, to crops and surface in making such change to be paid by the Company." *Id.*

15. In consideration for the easement, Manufacturers agreed to pay one dollar plus an additional three dollars per rod[1] for the right-of-way.

16. Importantly, the Easement Agreement further required that Manufacturers provide the Klaphake Farm with a "[t]ap to be installed on this line at point nearest the residence." *Id.* The tap is a device that allows the Klaphake Farm to purchase and receive gas directly from the pipeline. The tap is a critical element of the consideration under the Easement Agreement because without a tap the Klaphake Farm would not have access to gas service from Columbia Gas or any other distribution company.

17. Pursuant to the Easement Agreement, CGT continues to transmit gas along the right-of-way, and Ms. Klaphake pays Columbia Gas for gas received via the tap, as she has done for the entirety of her 60 years at the Klaphake Farm.

### B. CGT's Plan to "Replace" the Pipeline

18. In February 2015, CGT applied to the Federal Energy Regulatory Commission ("FERC") for authorization to "replace" its existing Line 1570 pipe with a new line of pipe. (Exhibit 2, Abbreviated Application of Columbia Gas Transmission, LLC for a Certificate of Public Convenience and Necessity)

---

[1] A rod is a unit of length equal to 16.5 feet.

19. CGT's Line 1570 includes the pipeline that lies on the Klaphake Farm and is the subject of this action. As part of this "replacement" project, CGT would lay a new line of pipe across a different section of the Klaphake Farm. The existing pipeline would be abandoned and left in place on the Klaphake Farm, according to CGT.

20. In its application to FERC, CGT further announced that it intends to "remove the mainline 'farm' taps presently attached to segments of Line 1570 proposed for abandonment." *Id.* at 6.

21. CGT's plan to abandon the existing pipeline on the Klaphake Farm and remove the tap that provides gas service violates the terms of the Easement Agreement.

22. Ms. Klaphake does not seek to prevent CGT from changing the location of its pipeline under the terms of the Easement Agreement. In fact, the Easement Agreement sets forth the parties' rights and obligations if CGT chooses to do so.

23. In clear and unambiguous language, the Easement Agreement provides that CGT "may at any time lay, maintain, operate, repair and remove a second line of pipe alongside of the first line as herein provided, upon the payment of a like consideration, and subject to the same conditions; also may change the site of its pipes, the damages, if any, to crops and surface in making such change to be paid by Company." (Exhibit 1)

24. The Easement Agreement also unambiguously provides that when CGT lays a second line (1) the company must pay like consideration to Ms. Klaphake and (2) the line is "subject to the same conditions." Because the Easement Agree expressly required CGT to install a tap on the first line "at the point nearest the residence," any additional line of pipe is subject to the same requirement. *Id.*

25. CGT's intended course of action with respect to the Klaphake Farm would violate the terms of the Easement Agreement in at least one more way as well. Specifically, the Easement

Agreement does not allow CGT to abandon the existing line of pipe. Under the terms of the agreement, CGT is allowed to "maintain, operate, repair and remove" the line. These four acts constitute the only conduct that CGT is allowed to take with respect to a pipeline laid on the Klaphake Farm. The first three permitted acts ("maintain, operate, repair") apply exclusively to a pipeline that is in use. The fourth term, "remove," is the only permissible act when the company no longer intends to use the pipeline.

### C. The Parties' Rights and Obligations Under the Easement Agreement are Outside FERC's Jurisdiction and Unaffected by FERC's Approval of the Line 1570 Project

26. CGT's obligations under the Easement Agreement are unconditional. There is no provision in the Easement Agreement that allows CGT to ignore its obligations simply because the company has chosen to move the line of pipe, especially since the Easement Agreement addresses precisely this circumstance and sets forth the parties' rights and obligations.

27. Nor are CGT's binding obligations pursuant to the Easement Agreement lessened or loosened by FERC's authorization of CGT's Line 1570 project. Although FERC authorized CGT to abandon portions of the Line 1570 and remove certain "farm taps," such authorization does not affect obligations that CGT has pursuant to its agreements with landowners such as Ms. Klaphake. This is not an area of uncertainty either; in fact, FERC reminded CGT of the limitations on the commission's jurisdiction when it approved CGT's first application for authorization with respect to Line 1570. (Exhibit 3, FERC Order Issuing Certificate to Columbia Gas Transmissions at p. 5, ¶ 15, 146 FERC ¶ 61,075, Docket No. CP13-478-000, February 7, 2014) ("Issues related to what rights Columbia may have to utilize the [landowner's] property under the current easement and whether or not additional compensation or a new conveyance may be required for additional uses

are beyond the jurisdiction of this Commission. Such issues may be addressed under state law in a court of competent jurisdiction.")[2]

28. Indeed, CGT itself told FERC that the company would abide by its existing easement agreements with landowners anywhere it sought to abandon pipeline, unless the landowners agreed otherwise. (Exhibit 2 at p. 6) ("Other than by specific agreements to the contrary with affected landowners, Columbia will retain its existing easements on property where existing pipeline is being proposed for abandonment.")

### D. Defendants Refuse To Abide By the Easement Agreement

29. Despite CGT's assurances to FERC, the company is unwilling to even acknowledge its obligations under the Easement Agreement.  Instead, CGT informed Ms. Klaphake and her son, Michael Klaphake,[3] that it would not even discuss installing a tap on the new pipeline. *See* Exhibit 4, Email from R. Hansen to M. Klaphake, dated April 5, 2016 ("I can only say that Columbia is removing all taps from transmission lines (as is the industry as a whole) and is not making concessions on this point now that Columbia Pipeline Group (us) and Columbia Gas of PA (the company that meters and bills you for your gas) are no longer under one umbrella.")

30. In an effort to convince Ms. Klaphake that CGT does not have any obligation to perform in accordance with the Easement Agreement, the company has besieged her with a labyrinth of confusing explanations and misleading representations regarding the parties' respective rights.

31. For example, CGT has told the Klaphakes that the company "is not making concessions" regarding the tap because it is "no longer under one umbrella with Columbia Gas." *Id.* CGT has

---

[2] Available at https://www.ferc.gov/CalendarFiles/20140207165559-CP13-478-000.pdf

[3] Cecyle Klaphake granted Michael Klaphake a limited power-of-attorney to represent her interests through negotiation with CGT.

also stated that service to the Klaphake Farm must be discontinued because Columbia Gas is unwilling to allow the use of a meter at the tap. This sort of corporate entity sleight of hand is not a new tactic for CGT and Columbia Gas. The two entities have employed similar tactics to escape their obligations under easement agreements even as far back as 40 years ago:

> Columbia Transmission argues that, because all of the retail operations of Ohio Fuel were 'spun-off' to Columbia Gas, so also was any duty to provide retail gas service under the right-of-way easement, despite Columbia Transmission's present ownership and operation of the pipeline.
> We reject defendant's contention that any duties under the right-of-way easement 'devolved' upon Columbia Gas of Ohio, pursuant to a corporate reorganization. Columbia Transmission admits that, since its merger with Ohio Fuel Gas Company, it has enjoyed the benefit of the easement by operating the pipeline which burdens Southgate's property
> ....
> The record reveals a course of business conduct which substantiates an 'understanding' between Columbia Gas and Columbia Transmission that Columbia Gas handle all of the retail customers. Even if consistently followed, this custom cannot be a basis for the abrogation of contractual liability.

Southgate Dev. Corp. v. Columbia Gas Transmission Corp., C.A. No. 2739, 1978 Ohio App. LEXIS 8295, at *5-6 (Ct. App. Dec. 20, 1978) (also rejecting Columbia Gas Transmission's argument that an "administrative order authorizes Columbia Transmission to use Southgate's land under the terms of the easement without fulfilling the bargain that was the consideration for that easement, the promise of natural gas service.")

## COUNT I - Action for Declaratory Judgment

32. Ms. Klaphake incorporates by reference each of the preceding paragraphs as if set forth fully herein.

33. The issues outlined above are adequately developed and are ripe for judicial review, and Ms. Klaphake will suffer direct, immediate and substantial hardship if review is delayed.

34. This action will settle controversies indicative of immediate and inevitable litigation, which can be determined more advantageously if settled promptly rather than at a future time when litigation is required.

35. This action will help terminate the controversy between the parties by clarifying the parties' rights and obligations under the Easement Agreement.

WHEREFORE, CECYLE KLAPHAKE respectfully requests that the Court enter a Declaratory Judgment declaring that

1. The rights and obligations of Columbia Gas Transmissions, LLC; Columbia Pipeline Group through its interest in Columbia Gas Transmissions; TransCanada Corporation, through its interest in Columbia Gas Transmissions; and Cecyle Klaphake are determined and prescribed by the 1946 Easement Agreement between the parties' predecessors-in-interest, insofar as those rights and obligations relate to pipeline laid on Ms. Klaphake's property by or to the benefit of Columbia Gas Transmissions, Columbia Pipeline Group, and/or TransCanada, including but not limited to Line 1570;

2. Pursuant to the 1946 Easement Agreement, Columbia Gas Transmissions; Columbia Pipeline Group through its interest in Columbia Gas Transmissions; TransCanada Corporation, through its interest in Columbia Gas Transmissions; and any successors in interests shall be required to install a tap on any line of pipe laid on the Klaphake Farm and said tap shall be installed at the point nearest the residence unless another location is preferable due to a reasonable concern related to safety, health, or the environment;

3. Under the terms of the 1946 Easement Agreement, Columbia Gas Transmissions; Columbia Pipeline Group through its interest in Columbia Gas Transmissions; TransCanada Corporation, through its interest in Columbia Gas Transmissions; and any successors in interests are not allowed to abandon the existing pipeline or any other pipeline laid on the Klaphake Farm;

4. Under the terms of the 1946 Easement Agreement, Columbia Gas Transmissions; Columbia Pipeline Group through its interest in Columbia Gas Transmissions; TransCanada Corporation, through its interest in Columbia Gas Transmissions; and any successors in interests must remove any pipeline laid on the Klaphake Farm once the pipeline is no longer in use for the transmission of oil or gas;

5. If Cecyle Klaphake, in her sole discretion, elects to allow abandonment rather than removal of the existing pipeline, such election confers an extra-contractual benefit upon Columbia Gas Transmissions; Columbia Pipeline Group through its interest in Columbia Gas Transmissions; TransCanada Corporation, through its interest in Columbia Gas Transmissions; and any successors in interests, and consideration shall be due to Ms. Klaphake in an amount to be determined by the parties; and

6. If new pipe is laid on the Klaphake Farm outside the easement prescribed by the 1946 Easement Agreement:

   a. Columbia Gas Transmissions shall pay Cecyle Klaphake "like consideration" for the laying of such additional pipe, as set forth in the 1946 Easement Agreement and adjusted for inflation using the Consumer Price Index; and

   b. Columbia Gas Transmissions shall also pay to Cecyle Klaphake damages to crops or surface, if any, caused by the change in location of the easement, in an amount to be determined in accordance with the procedure set forth in the 1946 Easement Agreement.

September 12, 2017                           Respectfully submitted,


                                            Steve Gibbs
                                            Gibbs LLC
                                            500 Grant Street, Suite 2900
                                            Pittsburgh, PA 15219
                                            Telephone: 412.515.1473
                                            Steve.Gibbs@GibbsLawLLC.com
                                            *Counsel for Plaintiff*

## VERIFICATION

The undersigned, *CECYLE KLAPHAKE*, avers that the statements of fact contained

in the attached COMPLAINT IN DECLARATORY JUDGMENT are correct to the best of

his/her information, knowledge and belief, and are made subject to the penalties of 18 Pa.

Consolidated Statutes Annotated § 4904 relating to unsworn falsifications to authorities.

Date: _8-24-17_                           Signature: _Cecyle Klaphake_

-12-

# EXHIBIT 1

ATTN: SALENE MAZUR KRAEMER

IRENE GLASS.

TO

THE MANUFACTURERS LIGHT & HEAT CO.

Form 1E. C SM 10-39 Pad 50    72
18946   INDEXED.

FOR AND IN CONSIDERATION OF One
& No/100 Dollars, to her in hand
paid, receipt of which is hereby
acknowledged, and the further

sum of Three & No/100 Dollars, per rod for right of way and any and all damages from construc-
tion and patrolling to be paid upon the acceptance of the survey now being made by the Company,
Irene Glass, widow (hereinafter called the Grantor), does hereby grant to The Manufacturers

## DEED BOOK No. 710                                                    661

Light & Heat Co. (hereinafter called the Company) its successors and assigns, the right to lay
a 20 inch pipe line, and maintain, operate, repair
and remove said lines along a line which has been surveyed for the same over and through her
township
land situate in Cecil Wkxxxxx Washington County, State of Pennsylvania, bounded and described
as follows:

On the North by lands of Grant Welch

On the East by lands of Wm. L. Hutchinson, Jr.

On the South by lands of Pittsburgh Coal Company

On the West by lands of Sam Chance; Jas. Cubbage

with the right of ingress, egress and regress to and from the same, the said Grantor to fully
use and enjoy the said premises, except for the purposes hereinbefore granted to the said
Company, and said Company to pay any damages which may arise to crops and fences from the re-
laying, maintaining and operating said pipe line; said damages if not mutually agreed upon,
to be ascertained and determined by three disinterested persons, one thereof to be appointed
by the Grantor, her heirs or assigns, one by the Company, its successors or assigns, and the
third by the two appointed as aforesaid, and the award of such three persons shall be final
and conclusive. And it is hereby further agreed, that the said Company, its successors and assigns,
may at any time lay, maintain, operate, repair and remove a second line of pipe alongside of
the first line as herein provided, upon the payment of a like consideration, and subject to the
same conditions; also may change the size of its pipes, the damages, if any, to crops and surface
in making such change to be paid by the Company.

Tap to be installed on this line at point nearest the residence.

IN WITNESS WHEREOF, the Grantor, sets her hand and seal this 27th day of May A.D. 1946.
SIGNED, SEALED AND DELIVERED IN PRESENCE OF

R. S. Bowman                                          Irene Glass          (SEAL)

ENTERED LAND DEPT.

# EXHIBIT 2

**UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION**

**ABBREVIATED APPLICATION
OF
COLUMBIA GAS TRANSMISSION, LLC
FOR A
CERTIFICATE OF PUBLIC CONVENIENCE AND NECESSITY**

**Docket No. CP15-___-000**

Tyler R. Brown, Senior Counsel for
**COLUMBIA GAS TRANSMISSION, LLC**
5151 San Felipe Suite 2500
Houston, TX 77056

**Filed: February 20, 2015**



**Columbia
Gas Transmission**

5151 San Felipe Suite 2500
Houston, TX 77056

Direct: 703.386.3797
tbrown@nisource.com

**Tyler R. Brown**
Senior Counsel

February 20, 2015

Ms. Kimberly D. Bose, Secretary
FEDERAL ENERGY REGULATORY COMMISSION
Room 1A, East
888 First Street, N.E.
Washington, D. C. 20426

Re:   **Columbia Gas Transmission, LLC
Tri-County Bare Steel Replacement Project
<u>Docket No. CP15-    -000</u>**

Dear Ms. Bose:

Attached for filing with the Federal Energy Regulatory Commission (Commission) is
Columbia Gas Transmission, LLC's (Columbia) application pursuant to Section 7(c) of the
Natural Gas Act (NGA), as amended, for permission and approval to, among other things,
replace approximately 34 miles of aging high pressure, bare steel pipeline on its Line 1570, located
in Greene, Washington, and Allegheny Counties, Pennsylvania.

Pursuant to Section 388.112(b) of the Commission's Regulations (18 C.F.R. Section
388.112(b)), Columbia has labeled all non-public information by category.   The
following exhibit to the application is being filed under separate cover:

Exhibit F-I   Environmental Report (several attachments filed as Public or
Privileged)

Material identified as Privileged Information has been excluded from the public version
of the application.

I have read and know the contents of the application and the contents are true to the best
of my knowledge and belief.

Very truly yours,

*Tyler R. Brown*

Tyler R. Brown
Senior Counsel

Attachments

cc:   Michael J. McGehee (w/attachments)
Rich McGuire (w/attachments)
Dave Swearingen (w/attachments)
Jeremiah Spiga (w/attachments)

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION


ABBREVIATED APPLICATION
OF
COLUMBIA GAS TRANSMISSION, LLC
FOR A
CERTIFICATE OF PUBLIC CONVENIENCE AND NECESSITY


Columbia Gas Transmission, LLC ("Columbia") hereby makes application, in abbreviated form, to the Federal Energy Regulatory Commission ("Commission") pursuant to Section 7(c) and Section 7(b) of the Natural Gas Act ("NGA"), as amended, and Part 157 of Commission's regulations for a Certificate of Public Convenience and Necessity authorizing the replacement of existing high pressure, bare steel pipeline located in Greene, Washington, and Allegheny Counties, Pennsylvania, hereinafter referred to as either the "Facilities", or as the "Tri-County" project. The replacement of the existing pipeline will enable Columbia to continue providing safe, reliable transportation service to its customer(s). Columbia respectfully requests the issuance of an order on or before December 1, 2015 to afford sufficient time for Columbia to complete right-of-way clearing by April 1, 2016 in accordance with potential agency mandated tree clearing restrictions.[1]

---

[1] The footprint of the proposed project lies primarily in the mountainous regions of southwest Pennsylvania. Due to the impact weather and terrain have on accessibility to construction sites Columbia experiences a somewhat abbreviated construction season. Significantly, this same geographic area is also home to certain threatened and endangered species. Efforts to preserve habitat for these species create limited windows of opportunity within which Columbia must engage in clearing existing or proposed pipeline rights-of-way and facility locations. These restrictions on construction activities necessarily result in compressed time frames in which Columbia must act in order to efficiently complete proposed construction.

I.
### APPLICANT INFORMATION
#### Regulations Section 157.6(b)(1)

Columbia respectfully requests that all Commission orders and correspondence, as well as pleadings and correspondence from other persons concerning this filing, be served upon the following:

| | |
|---|---|
| *James R. Downs, Vice President, Regulatory Affairs | (713) 386-3759  Fax: (713) 386-3755 |
| S. Diane Neal, Assistant General Counsel, Regulatory | (713) 386-3745 |
| *Tyler R. Brown, Senior Counsel | (713) 386-3797 |
| Columbia Gas Transmission, LLC 5151 San Felipe Suite 2500 Houston, TX 77056 jdowns@nisource.com dneal@nisource.com tbrown@nisource.com | |
| Michael D. Walker, Manager, FERC Certificates | (304) 357-2443  Fax:(304) 357-2770 |
| Columbia Gas Transmission, LLC P. O. Box 1273 Charleston, West Virginia 25325-1273 mdwalker@nisource.com | |
| Alex Oehler, Director, Government Affairs & Community Relations | (202) 216-9772  Fax: (202) 216-9785 |
| Columbia Gas Transmission, LLC 10 G Street, NE, Suite 400 Washington, DC 20002 aoehler@nisource.com | |
| Angela Braun, Community Relations & Stakeholder,Outreach Manager | (724) 416-6340 |
| 121 Champion Way Canonsburg, PA 15317 abraun@nisource.com | |

The exact legal name of Columbia is Columbia Gas Transmission, LLC, and its principal office is 5151 San Felipe, Suite 2500, Houston, TX 77056. Columbia, a Delaware limited liability company, is a wholly owned subsidiary of the Columbia Energy Group, which in turn is a wholly owned subsidiary of NiSource Inc. Columbia is authorized to do business in the states of

Delaware, Georgia, Indiana, Kentucky, Maryland, New Jersey, New York, North Carolina, Ohio,

Pennsylvania, Texas, Virginia, and West Virginia.

**II.**
**DESCRIPTION OF APPLICANT OPERATIONS**
**Regulations Section 157.6(b)(3)**

Columbia is a "natural gas company" as defined under the NGA, engaged primarily in

the business of transporting natural gas and operating underground storage fields in interstate

commerce under authorizations granted by and subject to the jurisdiction of the Commission.

Columbia operates facilities located in the states of Delaware, Kentucky, Maryland, New Jersey,

New York, North Carolina, Ohio, Pennsylvania, Virginia, and West Virginia.

**III.**
**DESCRIPTION OF PROPOSED ACTIVITY**
**Regulations Section 157.6(b)(4)**

**A.   Background**

Columbia is committed to the safe and reliable transportation and storage of natural gas.

Columbia operates an interstate transmission system comprised of approximately 12,000 miles

of interstate pipeline that delivers clean, affordable and domestically produced natural gas to a

variety of transportation customers, including local distribution companies who in turn redeliver

that gas to residential, commercial, industrial and institutional customers across the Midwest,

Mid-Atlantic and Northeast regions. A commitment to pipeline safety and a focus on

strengthening infrastructure is a cornerstone of the Columbia organization.

***1.   Columbia's Modernization Program***

Columbia has developed a multi-year, comprehensive modernization program to

address its aging infrastructure. The modernization program is designed to continue and

3

enhance pipeline safety and increase customer service reliability. To this end, Columbia is upgrading its system by investing approximately $2 billion in infrastructure improvements through 2017. The Commission approved a settlement in Docket No. RP12-1021-000 establishing the basis for recovering the costs of the modernization program on January 24, 2013 ("Settlement").[2] The Settlement did not, however, approve any specific project, hence the need for Columbia to file the instant application.

Columbia's modernization program identifies projects through a risk based prioritization process. Modernization projects are identified and prioritized by identifying aging infrastructure that: 1) operates at a relatively high level of risk, 2) will require upgrades to meet emerging regulations, and/or 3) has lower than desired reliability to meet current or future service requirements due to current design and/or condition. As a result of this project identification and prioritization process, Columbia proposes in the subject application to replace approximately 34 miles of aging high pressure, bare steel pipeline on its Line 1570.[3] Pipeline will be replaced in three distinct segments. From south to north, the Segment 1 replacement pipeline, located entirely in Greene County, will begin just north of the border between West Virginia and Pennsylvania, at the approximate site of Columbia's Hero-Jollytown regulator station, and continue approximately 15 miles in a northerly direction to Columbia's existing Waynesburg Compressor Station. Segment 2 located entirely in Washington County, begins at a point near Columbia's existing Redd Farm Compressor Station[4], and continues approximately 11 miles in a northerly direction to the existing Sharp Farm station. Segment 3 commences at Columbia's Sharp Farm station, and continues approximately 12 miles in a northerly direction to the

---

[2] Columbia Gas Transmission, LLC, Order Approving Contested Settlement; 142 FERC ¶ 61,062 (2013).
[3] Total construction length with the incorporation of minor reroutes is approximately 38 miles. Subsequent references to pipeline mileage will be based on the length of replacement pipeline.
[4] Columbia Gas Transmission, LLC, 145 FERC ¶ 61,257 (2013).

4

terminus of Line 1570 where it intersects with 20-inch Line 1485 in Allegheny County. Each of these segments is depicted on a map attached hereto as Exhibit F.

### 2. Existing Facility Background

Line 1570 is one of Columbia's main transmission pipelines in western Pennsylvania. Since the mid-1900's Columbia has relied upon Line 1570, along with other pipelines, to meet the gas requirements of the Pittsburgh metropolitan area. Columbia's existing uncoated 20-inch bare steel, pipeline, which is the subject of the instant application, was installed in 1947 and 1948.[5] Line 1570 directly receives gas in this area of southwestern Pennsylvania. Depending upon the seasonal requirements of the major markets served through the pipeline, the direction of gas flow could change. Specifically, during periods of high demand, gas flows north to be consumed in the Pittsburgh metro area, while during other periods gas may flow south to meet the requirements of other markets.

Due to the need to replace aging infrastructure along Line 1570, a significant length of the existing bare steel pipeline has already been replaced. Columbia replaced approximately 18.5 miles of 20-inch Line 1570 high pressure, bare steel pipeline during 2014.[6]

### B. Project Proposal

As previously described, Columbia will undertake the proposed replacement in three distinct segments. Due to the differences in operating and seasonal load characteristics of each of the segments to be replaced, Columbia's construction plan will differ by segment. Segment 1 (PA-WV State Line to Waynesburg Compressor Station) and Segment 3 (Sharp Farm Station to

---

[5] Manufacturers Light and Heat Co., 5 FPC 707 (1946).
[6] Columbia Gas Transmission, LLC, 146 FERC ¶ 61,075 (2014) (Commission order issuing certificate of public convenience and necessity authorizing the replacement of pipeline from Redd Farm Compressor Station to Waynesburg Compressor Station).

the end of Line 1570) will be replaced by traditional lift-and-lay techniques. Thus, service through these segments of Line 1570 may be interrupted for extended periods while the existing pipeline is depressurized and removed, and the new replacement pipeline is installed in approximately the same location, where feasible.[7] In contrast, replacement of Segment 2 (Redd Farm Compressor Station to Sharp Farm Station) is constrained by contract delivery obligations, requiring installation of new replacement pipeline while keeping the existing pipeline in service. The new replacement pipeline for Segment 2 will be connected to Segments 1 and 3 after construction of Segment 2 has been completed. Short duration outages may be required to tie in new facilities on this segment. The proposed pipeline for Segment 2 will be off-set approximately 25 feet from the existing Line 1570 centerline for approximately 4.3 of the approximately 8 miles that is being replaced. The remainder of Segment 2 will require rerouting due to existing constraints and terrain issues, sensitive resources, or identified landowner concerns, preventing construction immediately adjacent to the existing Line 1570 right-of-way corridor.

Other than by specific agreements to the contrary with affected landowners, Columbia will retain its existing easements on property where existing pipeline is being proposed for abandonment.

The instant proposal will affect consumers currently receiving gas through Columbia's existing Line 1570 pipeline---consumers that are customers of the local distribution company serving this area. The consumers identified on Exhibit Z are customers of Columbia Gas of Pennsylvania, a local distribution company, and are receiving their gas service through facilities owned by Columbia. Columbia will remove the mainline "farm" taps presently attached to segments of Line 1570 proposed for abandonment. Columbia will compensate the landowners

---

[7] Approximately 89% of Segments 1 and 3 will be replaced using the same centerline or co-located within approximately 25 feet from the existing Line 1570 centerline.

whose service will be eliminated as a result of the facility changes proposed herein to either facilitate transition to an alternative source of energy, e.g., propane, or reconnect service to another natural gas pipeline.

As described above, Columbia anticipates replacing Line 1570 in discrete segments, anticipating that construction will occur over a two year period in 2016 and 2017. Accordingly, Columbia requests that Commission authorization provide for completion of construction over a two year period should replacement of Line 1570 be authorized as proposed in the instant application.

### C.  Project Costs

As set forth in Exhibit K hereof, the total estimated installed cost of the proposed Facilities is approximately $136.0 million.

### D.  Allowance for Funds Used During Construction

Columbia represents that the Allowance for Funds Used During Construction ("AFUDC") accruals included in the estimated cost of the Tri-County project, reflected in Exhibit K hereto, are in compliance with the Commission's policy on AFUDC accruals as set forth in the AD10-3-000 proceeding.[8] Moreover, Columbia affirms that project related capital expenditures, and activities necessary to prepare the project for its intended use were in progress at the time accruals commenced.

### E.  Request for a Pre-determination for Rolled-in Rate Treatment

---

[8] Southern Natural Gas Co., et al., 130 FERC ¶ 61,193 (2010).

Replacing approximately 34 miles of Columbia's existing 20-inch Line 1570 pipeline is consistent with the requirements for rolled-in rate treatment described in the Commission's 1999 Pricing Policy Statement ("Policy Statement").[9]   As previously stated, the primary purpose of this project is to replace existing bare steel pipeline due to the age and condition of these facilities. As described in the Policy Statement, the Commission's no-subsidy policy recognizes that existing customers pay the costs of projects designed to improve their service by replacing existing capacity, improving reliability, or providing additional flexibility.

The Policy Statement identified three different types of projects where it may be appropriate to authorize rolled-in rate treatment for new construction. The scenarios identified by the Commission include an expansion project to provide additional service, a project to improve service to existing customers by replacing existing facilities, improving reliability, or providing additional flexibility, and a project that combines an expansion for new service with improvements for existing customers. The Tri-County project satisfies the criteria in the Policy Statement. Rolled in rate treatment is appropriate for projects such as the Tri-County project which proposes replacement of existing pipeline that will improve existing service to existing customers, by enhancing reliability and safety well into the future.

### F.  Other Factors Requiring Consideration

The Policy Statement further requires consideration of adverse effects on i) existing customers of Columbia; ii) other existing pipelines and their customers; and iii) affected landowners and communities.

---

[9] Certification of New Interstate Natural Gas Pipeline Facilities, Statement of Policy, 88 FERC ¶ 61,227 (1999).  Certification of New Interstate Natural Gas Pipeline Facilities, Statement of Policy, 88 FERC ¶ 61,227 (1999). Order Clarifying Statement of Policy, 90 FERC ¶ 61,128 (2000).  Order Further Clarifying Statement of Policy, 92 FERC ¶ 61,094 (2000).

a. **Existing Columbia Customers**

As discussed above, neither Columbia's existing customers nor their service will be adversely affected by the project.  Rather, the project will enhance the reliability and safety of Columbia's system.

b. **Existing Pipelines and their Customers**

The project does not adversely affect other pipelines or their customers inasmuch as it does not target new customers which may be served by other pipelines.

c.  **Landowners and Communities**

As more fully described in the Environmental Report submitted separately as Exhibit F-I to this application, impact on landowners and communities has been minimized to the extent feasible by use of previously established rights-of-way and utility corridors, as well as by limiting construction to property owned by Columbia where existing facilities are currently located. The project will involve installation of a pipeline parallel to existing facilities (offset), or within the same ditch (lift-and-lay), and will generally follow the existing pipeline corridor, except to avoid environmentally sensitive features or encroachments that exist in the Line 1570 permanent right-of-way. Exercise of eminent domain authority to supplement Columbia's existing easements may be required in certain instances. For example, where existing easement rights are insufficient to accommodate the additional pipe adjacent to Columbia's existing rights-of-way, or where the new facilities require acquisition of entirely new right-of-way to avoid an environmentally sensitive area or a construction obstacle, and a voluntary acquisition is not achievable under reasonable terms. Consistent with Columbia's normal practice, the exercise of eminent domain authority to obtain required land rights will be used only should efforts to negotiate an agreement acceptable to both the landowner and Columbia be exhausted.

**G.  Outreach and Pre-filing Activities**

Columbia's representatives began meeting with stakeholders in February and March of 2014, in advance of submission of Columbia's request to enter the Commission's pre-filing process. Columbia requested entry into the Commission's pre-filing process for the Tri-County project on May 1, 2014, received approval to use the pre-filing process on May 27, 2014, and was assigned Docket No. PF14-11. Within two weeks of the Commission's Staff issuing

approval for Columbia to enter into the pre-filing process, open houses were scheduled for June 18 and June 19, 2014 in Rogersville and Canonsburg, Pennsylvania, and invitations to attend were disseminated to the Commission, landowners, public officials, and other interested stakeholders soon thereafter. In addition to the abovementioned open houses, Columbia facilitated an information session in Washington, Pennsylvania, on June 3, 2014, for the benefit of the Meadowbrook Home Owners Association. This session was held in response to a high volume of landowner questions regarding direct-mail detailing Columbia's anticipated presence in the neighborhood. Information that was provided during the open houses and the information session included, but was not limited to the following:

   a. Overview of the Tri-County project, mounted aerial and topographical maps, and information stations staffed by Columbia project team members from various disciplines;

   b. Sign-up sheets and follow-up sheets for individual landowner inquiries on matters which a landowner desired additional information; and

   c. Copies of *"An Interstate Natural Gas Facility on My Land? What Do I Need to Know?,"* information about pipeline safety and environmental mitigation measures.

During the pre-filing process and prior to filing the instant application, Columbia conducted over 25 meetings with officials at the Federal, State and local levels, in addition to conversations with landowners and other interested stakeholders along the proposed route. Those meetings and conversations provided information regarding the Tri-County project, the pre-filing process, stakeholder meetings, open houses, as well as where Tri-County project information could be found. Columbia encouraged stakeholders to participate in the Commission's pre-filing process. Additionally, Columbia is maintaining a website for the project that contains project and contact information.

These efforts were designed to inform, communicate and listen to feedback, and have resulted in modifications to Columbia's proposed route. Through a comprehensive consultation

process with affected stakeholders, Columbia sought to develop a technically feasible pipeline route that balances a multitude of factors including, but not limited to, the number of landowners affected, impact to the environment, constructability and engineering requirements and safety, as well as cost implications; while at the same time meeting customer needs for increased reliability. As with other outreach activities, Columbia's overarching goal was and is to submit a thorough certificate application that adequately supports the need for the Tri-County project, demonstrates mitigation of the project's impacts, and is responsive to affected stakeholder input received to date.

Columbia submitted preliminary draft Resource Report Nos. 1 and 10 on June 27, 2014. Subsequently, Columbia filed a complete set of draft Resource Reports by November 21, 2014. On February 18, 2015, the Commission's Staff issued comments on draft Resource Reports previously filed by Columbia. Columbia has addressed the Commission Staff's comments and has incorporated all requested information in the Resource Reports provided in the Environmental Report submitted with the instant application.

Columbia will continue to provide current information on the Tri-County project and facilitate involvement by stakeholders, as well as keep stakeholders informed of project developments in person, by phone, via email and regular mail.

**IV.**
**PUBLIC CONVENIENCE AND NECESSITY**
**<u>Regulations Section 157.6(b)(2)</u>**

Columbia requests authority to modernize existing facilities by replacement as more fully described above. Replacement as proposed accomplishes improvements in reliability and safety for existing customers and landowners. For the foregoing reasons, Columbia submits that

11

the proposed construction required for the Tri-County project is required by the present and future public convenience and necessity.

## V.
## RELATED REQUIREMENTS
### Regulations Section 157.6(b)(5)

Columbia is not aware of any application to any federal, state or other regulatory body that will be necessary to effectuate or supplement the proposal.

## VI.
## REQUEST FOR SHORTENED PROCEDURE
### Regulations Section 157.6(c)

Columbia requests that this application be processed pursuant to Section 385.802 of the Commission's Rules of Practice and Procedure and hereby waives oral hearing and the opportunity for filing exceptions to the decision of the Commission and requests the Commission to omit the intermediate decision procedure.

## VII.
## ABBREVIATED APPLICATION
### Regulations Section 157.7(a)

This application is abbreviated pursuant to Section 157.7 of the Commission's Regulations under the NGA. Columbia respectfully submits that an abbreviated application is justified and that the data and information contained herein are sufficient to provide a full and complete understanding of Columbia's request, as well as the effect upon Columbia's present and future operations.

WHEREFORE, Columbia respectfully requests that the Commission issue a certificate of public convenience and necessity authorizing the construction and operation of the proposed Facilities and approval for the abandonment of the facilities being replaced. Columbia

respectfully requests Commission authorization no later than December 1, 2015 to enable Columbia to complete post certificate compliance requirements and right-of-way clearing by April 1, 2016 in accordance with potential agency mandated tree clearing restrictions.

**VIII.**
**TABLE OF CONTENTS**
**Regulations Section 157.6(b)(6)**

The table of contents required by Section 157.14 of the Commission's regulations is as follows:

**EXHIBIT A - ARTICLES OF INCORPORATION AND BYLAWS:** Columbia incorporates by reference herein Exhibit A of its application in Docket No. CP10-492-000.

**EXHIBIT B - STATE AUTHORIZATION:** Columbia incorporates by reference herein Exhibit B of its application in Docket No. CP10-492-000.

**EXHIBIT C - COMPANY OFFICIALS:** Columbia incorporates by reference herein Exhibit C of its application in Docket No. CP15-87-000.

**EXHIBIT D - SUBSIDIARIES AND AFFILIATION:** Neither Columbia nor any of its officers or directors, directly or indirectly, owns, controls, or holds with power to vote, 10% or more of the outstanding voting securities of any other person or organized group of persons currently engaged in the production, transportation, distribution or sale of natural gas, or of any person or organized group of persons currently engaged in the construction or financing of such enterprises or operations. Note, however, that Columbia is a participant in two separate and unrelated entities who are involved in the transportation and storage of gas in interstate commerce. Columbia holds a 47.5% membership interest in Millennium Pipeline Company, LLC, and a 50% interest in Hardy Storage Company, a joint venture between Columbia Hardy Corporation (which is a subsidiary of Columbia) and Piedmont Hardy Storage Company, LLC (which is an affiliate of Piedmont Natural Gas Company, Inc). Hardy Storage Company owns

13

and operates a natural gas storage field in West Virginia and provides storage service in conjunction with certain transportation service provided by Columbia.  Columbia itself is a wholly owned subsidiary of the Columbia Energy Group, which in turn is a wholly owned subsidiary of NiSource Inc.

**EXHIBIT E - OTHER PENDING APPLICATIONS AND FILINGS:** Omitted.

**EXHIBIT F - LOCATION OF FACILITIES:** Attached.

**EXHIBIT F-I – ENVIRONMENTAL REPORT:** Attached under separate cover.

**EXHIBIT G - FLOW DIAGRAMS:** Omitted. Like size replacement of existing facilities. No new capacity will be created as a result of constructing the proposed Facilities.

**EXHIBIT G-I - FLOW DIAGRAM - MAXIMUM CAPABILITIES:** Omitted. Refer to Exhibit G.

**EXHIBIT G-II - FLOW DIAGRAM DATA:** Omitted.  Refer to Exhibit G.

**EXHIBIT H - TOTAL GAS SUPPLY DATA:** Omitted.  Columbia does not propose any new sales service.

**EXHIBIT I - MARKET DATA:** Omitted. Project involves replacement of existing facilities.

**EXHIBIT J – FEDERAL AUTHORIZATIONS:** Attached.

**EXHIBIT K - COST OF FACILITIES:** Attached.

**EXHIBIT L - FINANCING:** Omitted.  Columbia will finance the construction of proposed facilities with funds generated from internal sources and through credit arrangements with NiSource, Inc.

**EXHIBIT M - CONSTRUCTION, OPERATION AND MANAGEMENT:** Omitted.  The proposed facilities will be constructed by one or more independent construction firms and Columbia employees.  The facilities will be operated and maintained by Columbia employees.

**EXHIBIT N - REVENUE, EXPENSES, AND INCOME:** Omitted.  Columbia's proposed facilities are intended to maintain and enhance the reliability of currently authorized service.

**EXHIBIT O - DEPRECIATION, DEPLETION AND AMORTIZATION:** Omitted.  The facilities proposed will be depreciated at depreciation rates in effect from time to time for similar facilities on Columbia's system.

**EXHIBIT P - TARIFFS:** Omitted. No change is contemplated in Columbia's presently effective Gas Tariffs as a result of this application.

**EXHIBIT T - RELATED APPLICATIONS:** Omitted.  Columbia was authorized to construct, own and operate the sections of Line 1570 which are the subject of this application in Docket No. G-737.

**EXHIBIT U - CONTRACTS AND OTHER AGREEMENTS:**   Omitted. Columbia has not entered into any agreements that will have an effect on the proposed abandonment.

**EXHIBIT V - FLOW DIAGRAMS:**  Omitted.  See Exhibit G.

**EXHIBIT W - IMPACT ON CUSTOMERS:** Omitted. The proposal will not result in abandonment of any customer's service. Mainline tap consumers previously served from Line 1570 will be either converted to an alternate source of energy, or reconnected to another source of gas supply.

**EXHIBIT X - EFFECT OF THE ABANDONMENT ON EXISTING TARIFFS:**  Omitted. Columbia does not propose any revisions to its existing tariffs as a result of the abandonment.

**EXHIBIT Y - ACCOUNTING TREATMENT OF ABANDONMENT:**  Attached.

**EXHIBIT Z – MAINLINE TAP CONSUMERS TO BE ABANDONED:**  Attached.

**EXHIBIT Z-1 – NON-DISCLOSURE (FORM OF PROTECTIVE) AGREEMENT, pursuant to 18 CFR § 388.112):**  Attached.

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

**COLUMBIA GAS TRANSMISSION, LLC**              DOCKET NO.  CP15-_____-000

NOTICE OF APPLICATION
(Date of Issuance)

Take notice that on February 20, 2015, Columbia Gas Transmission, LLC (Columbia), 1700 MacCorkle Avenue, S.E., Charleston, West Virginia 25314 filed with the Federal Energy Regulatory Commission ("Commission") an application under Sections 7(c) and 7(b) of the Natural Gas Act to replace approximately 34 miles of existing 20-inch diameter pipeline with like size pipeline in Greene, Washington, and Allegheny counties, Pennsylvania, and install necessary appurtenant facilities associated with the replacement pipeline, as more fully detailed in the application.

Any questions regarding this application should be directed to counsel for Columbia, Tyler R. Brown, Senior Counsel, Columbia Gas Transmission, LLC, 5151 San Felipe Suite 2500, Houston, TX 77056; telephone 713-386-3797.

Any person desiring to intervene or to protest this filing must file in accordance with Rules 211 and 214 of the Commission's Rules of Practice and Procedure (18 CFR 385.211 and 385.214). Protests will be considered by the Commission in determining the appropriate action to be taken, but will not serve to make protestants parties to the proceeding. Any person wishing to become a party must file a notice of intervention or motion to intervene, as appropriate. Such notices, motions, or protests must be filed on or before the comment date. Anyone filing a motion to intervene or protest must serve a copy of that document on the Applicant. On or before the comment date, it is not necessary to serve motions to intervene or protests on persons other than the Applicant.

The Commission encourages electronic submission of protests and interventions in lieu of paper using the "eFiling" link at http://www.ferc.gov. Persons unable to file electronically should submit an original and 14 copies of the protest or intervention to the Federal Energy Regulatory Commission, 888 First Street, N.E., Washington, D.C. 20426.

This filing is accessible on-line at http://www.ferc.gov, using the "eLibrary" link and is available for review in the Commission's Public Reference Room in Washington, D.C. There is an "eSubscription" link on the web site that enables subscribers to receive email notification when a document is added to a subscribed docket(s). For assistance with any FERC Online service, please email FERCOnlineSupport@ferc.gov, or call (866) 208-3676 (toll free). For TTY, call (202) 502-8659.


Kimberly D. Bose, Secretary


Comment Date: 5:00 p.m. Eastern Time on _____

EXHIBIT F

DOCKET NO. CP15-_____-000

**COLUMBIA GAS TRANSMISSION, LLC**

**LOCATION OF FACILITIES**



**Columbia Gas Transmission**

**Greene, Washington, Allegheny County, PA**
Tri-County Bare Steel Replacement
Replace 34 miles of existing line 1570 in three distinct sections

- - - - Replacement
———— Existing Pipeline
△ Existing Compressor Station

G:\ArcGIS_SpecialMapping\SpecialRequests\FERC-Maps\LINE1570 TRI-COUNTY BARE STEEL REPLACEMENT.mxd



Greene, Washington, Allegheny County, PA

Columbia
Gas Transmission

Tri-County Bare Steel Replacement
Replace 34 miles of existing line 1570 in three distinct sections

Section 1

——— Replacement
——— Existing Pipeline
△ Existing Compressor Station

0    2.5    5
            Miles

G:\ArcGIS_SpecialMapping\SpecialRequests\FERC-Maps\LINE1570 TRI-COUNTY BARE STEEL REPLACEMENT_1.mxd



**Columbia Gas Transmission**

Greene, Washington, Allegheny County, PA

Tri-County Bare Steel Replacement
Replace 34 miles of existing line 1570 in three distinct sections

—— Replacement
—— Existing Pipeline
△ Existing Compressor Station

G:\ArcGIS_Special\Mapping\SpecialRequests\FERC-Maps\LINE1570 TRI-COUNTY BARE STEEL REPLACEMENT_2.mxd



**Columbia Gas Transmission**

Greene, Washington, Allegheny County, PA
Tri-County Bare Steel Replacement
Replace 34 miles of existing line 1570 in three distinct sections

Section 3

— Replacement
— Existing Pipeline
△ Existing Compressor Station

EXHIBIT F- I

DOCKET NO. CP15-_____-000

<u>COLUMBIA GAS TRANSMISSION, LLC</u>

<u>ENVIRONMENTAL REPORT</u>

**(Attached under separate cover)**

**EXHIBIT J**

**DOCKET NO. CP15-_____-000**

## COLUMBIA GAS TRANSMISSION, LLC

## FEDERAL AUTHORIZATIONS

EXHIBIT J

DOCKET NO. CP15-_____-000

| Permit/Approval | Administering Agency | Anticipated Submittal | Anticipated Receipt | Contact and Phone Number |
|---|---|---|---|---|
| Certificate of Public Convenience and Necessity, National Environmental Policy Act Compliance for Jurisdictional Project | Federal Energy Regulatory Commission | February 2015 | October 2015 | Jeremiah Spiga 202-502-6485 |
| Clean Water Act (CWA) Section 404/401 Water Quality Certification Section 10 of the Rivers and Harbors Act | U.S. Army Corps of Engineers (USACE) Pittsburgh District | February 2015 | December 2015 | Josh Shaffer, Senior Regulatory Specialist (412) 395-7121 |
| Section 106 National Historic Preservation Act (NHPA) Consultation | Pennsylvania Historic and Museum Commission State Historic Preservation Office | November 2014 | December 2015 | Kira M. Heinrich, Archaeological Reviewer 717.705.0700 |
| Section 7 Endangered Species Act (ESA) Consultation, Migratory Bird Treaty Act (MBTA) Compliance | United States Fish & Wildlife Service - Pennsylvania Field Office | August 2014[1] | NA | Robert Anderson 814-234-2223 |
| Native American Consultations | Various tribes (Tribes who may have an interest in the Project area will be sent Project Information letters) | August 2014 | To Be Determined | Various |
| Clean Water Act NPDES Hydrostatic Water Discharge (Hydrostatic Testing Discharge Permit PAG-10) | PADEP SW Regional Office, Office of Water | Spring 2015 | Fall 2015 | Andrew Gaul 717-787-8184 |

[1] Columbia is consulting with USFWS via the Multi-Species Habitat Conservation Plan

EXHIBIT K

DOCKET NO. CP15-_____-000

## COLUMBIA GAS TRANSMISSION, LLC

## COST OF FACILITIES

EXHIBIT K

DOCKET NO. CP15-_____-000

COLUMBIA GAS TRANSMISSION, LLC
TRI-COUNTY REPLACEMENT PROJECT

PROJECT FACILITIES

| LINE NO. | DESCRIPTION | Waynesburg South $ | Redd Farm to Sharp Farm $ | Sharp Farm North $ | Total $ |
|---|---|---|---|---|---|
| | **Replacement Facilities** | | | | |
| 1 | MATERIALS | 5,942,000 | 5,687,000 | 4,623,000 | 16,252,000 |
| 2 | LABOR | 1,162,000 | 713,000 | 581,000 | 2,456,000 |
| 3 | RIGHTS-OF-WAY | 5,607,000 | 3,072,000 | 2,733,000 | 11,412,000 |
| 4 | SURVEYS | 943,000 | 660,000 | 544,000 | 2,147,000 |
| 5 | DAMAGES | 1,050,000 | 562,000 | 562,000 | 2,174,000 |
| 6 | ENGINEERING & INSPECTION | 4,865,000 | 2,897,000 | 2,768,000 | 10,530,000 |
| 7 | LEGAL FEES | 205,000 | 555,000 | 555,000 | 1,315,000 |
| 8 | OUTSIDE SERVICES | 31,303,000 | 18,359,000 | 16,253,000 | 65,915,000 |
| 9 | OTHER COSTS | 4,490,000 | 3,595,000 | 1,336,000 | 9,421,000 |
| 10 | CONTINGENCY | 354,000 | 2,882,000 | 759,000 | 3,995,000 |
| 11 | ESCALATION | 0 | 0 | 0 | 0 |
| 12 | AGSEO | 3,166,000 | 2,133,000 | 1,761,000 | 7,060,000 |
| 13 | SUBTOTAL REPLACEMENT COSTS | 59,087,000 | 41,115,000 | 32,475,000 | 132,677,000 |
| 14 | AFUDC | 1,407,000 | 1,001,000 | 923,000 | 3,331,000 |
| 15 | TOTAL REPLACEMENT COSTS | 60,494,000 | 42,116,000 | 33,398,000 | 136,008,000 |

**EXHIBIT Y**

**DOCKET NO. CP15-_____-000**

## COLUMBIA GAS TRANSMISSION, LLC

## ACCOUNTING TREATMENT OF ABANDONMENT

EXHIBIT Y
DOCKET NO. CP15-_____-000
Sheet 1 of 2

## COLUMBIA GAS TRANSMISSION CORPORATION

Estimated Net Debit to Accumulated Provision
for Depreciation Due to the Proposed Abandonment at
Line 1570

| Proposed Abandonment | Account Number | Account Title | Book Cost of Plant Retired From Service $ | Cost of Retirement $ | Salvage $ | ARO Settlement | Estimated Net Debit to Accumulated Provision for Depreciation $ |
|---|---|---|---|---|---|---|---|
| Line 1570 | | Transmission Plant | | | | | |
| | 367 | Mains | 6,265,420 | | | | |
| | 372 | Asset Retirement Costs | 1,557,224 | | | | |
| | | Total Transmission Plant | 7,822,644 | 2,312,520 | - | (710,589) | 9,424,575 |

**EXHIBIT Y**
**DOCKET NO. CP15-_____-000**
Sheet 2 of 2

COLUMBIA GAS TRANSMISSION CORPORATION
Pro Forma Accounting Entries
To Record the Proposed Abandonment at
Line 1570

| Account Number | Account Title | Detail $ | Debit $ | Credit $ |
|---|---|---|---|---|
| | **I** **To Record Retirement of Plant** | | | |
| 108 | Accumulated Provision for Depreciation of Gas Utility Plant | | 7,822,644 | |
| 101 | Gas Plant in Service | | | 7,822,644 |
| | **Gas Plant to be Retired** | | | |
| | **Transmission Plant** | | | |
| 367 | Mains | 6,265,420 | | |
| 372 | Asset Retirement Costs | 1,557,224 | | |
| | Total Transmission Plant | 7,822,644 | | |
| | Total Gas Plant to be Retired | 7,822,644 | | |
| | **II** **To Record Cost of Retiring** | | | |
| 108 | Accumulated Provision for Depreciation of Gas Utility Plant | | 2,312,520 | |
| 131 | Cash | | | 2,312,520 |
| | **III** **To Record Salvage** | | | |
| 131 | Cash | | - | |
| 108 | Accumulated Provision for Depreciation of Gas Utility Plant | | | - |
| | **IV** **To Record Settlement of ARO** | | | |
| 230 | Asset Retirement Obligation Liability | | 1,610,589 | |
| 108 | Accumulated Provision for Depreciation of Gas Utility Plant | | | 710,589 |
| 131 | Cash | | | 900,000 |

EXHIBIT Z

DOCKET NO. CP15-_____-000

## COLUMBIA GAS TRANSMISSION, LLC

## MAINLINE TAP CONSUMERS TO BE ABANDONED

EXHIBIT Z

DOCKET NO. CP15-_____-000

| Consumer Name | PSID Number | Address |
|---|---|---|
| Shana Harbison | 400496382 | 250 Whittengale Road, Oakdale, PA 15071 |
| Alan M Davis | 400159369 | 240 Whittengale Road, Oakdale, PA 15071 |
| Ronald Desmett | 400503116 | 260 Whittengale Road, Oakdale, PA 15071 |
| Wendy R Heinz | 400159368 | 320 Whittengale Road, Oakdale, PA 15071 |
| Paul Thiem | 400159367 | 12 Sitarik Road, McDonald, PA 15057 |
| Janet Meyers | 400159348 | 7500 Noblestown Road, Oakdale, PA 15071 |
| Heather Cerciello | 400459854 | 2011 North Road A, McDonald, PA 15057 |
| Dean Culley | 400168321 | 3137 Robinson Run Road, McDonald, PA 15057 |
| Kenneth N Wittebort | 400168320 | 3141 Robinson Run Road, McDonald, PA 15057 |
| Walter Stein | 400168318 | 3135 Robinson Run Road, McDonald, PA 15057 |
| Diana Maitland | 400168322 | 3145 Robinson Run Road, McDonald, PA 15057 |
| Michael Cardillo Jr | 500038676 | 3122 Robinson Run Road, McDonald, PA 15057 |
| Augustine Orlandi | 400168326 | 3129 Robinson Run Road, McDonald, PA 15057 |
| Robert J Barufaldi | 400168319 | 3143 Robinson Run Road, McDonald, PA 15057 |
| Stella V Hanzel | 400168324 | 3133 Robinson Run Road, McDonald, PA 15057 |
| Patrick Meehan | 400168325 | 3131 Robinson Run Road, McDonald, PA 15057 |
| Thomas G Iagnemma | 400168323 | 3147 Robinson Run Road, McDonald, PA 15057 |
| Patrick F Meehan III | 400168316 | 3149 Robinson Run Road, McDonald, PA 15057 |
| David Heaps | 400497626 | 3151 Robinson Run Road, McDonald, PA 15057 |
| Kristan T Mosley | 500132374 | 510 Sunset Lane, McDonald, PA 15057 |
| Danny Lauderbaugh | 400168314 | 1000 Cecil Reissing Road, McDonald, PA 15057 |
| Cecyle E Klaphake | 400163839 | 416 Coleman Road, McDonald, PA 15057 |
| Michelle Obosky | 400502530 | 104 Williams Street, McDonald, PA 15057 |
| Joseph B Magliocca | 400163692 | 102 Williams Street, McDonald, PA 15057 |
| Thomas K Roby | 400510323 | 10 Ridgewood Drive, McDonald, PA 15057 |
| Matthew R Hansen | 400505964 | 106 Williams Street, McDonald, PA 15057 |
| Lawrence M Cooper | 400163841 | 146 Cumer Road, McDonald, PA 15057 |
| Robert Cowden | 400167325 | 158 Ciaffoni Road, Canonsburg, PA 15317 |
| Harry Hancq | 400463748 | 600 Chartiers Run Road, Canonsburg, PA 15317 |
| Shawn Delaney | 400166299 | 727 Ridge Avenue Extension, Canonsburg, PA 15317 |
| Rachel L Rodgers | 400166301 | 735 Ridge Avenue, Canonsburg, PA 15317 |
| Travis R Guzel | 400166300 | 741 Ridge Avenue, Canonsburg, PA 15317 |
| Richard W Schneider Jr | 400168315 | 506 Sunset Lane, McDonald, PA 15057 |
| Larry Wise | 400510374 | 268 Hero Road, New Freeport, PA 15352 |
| James Roberts | 400254057 | 1436 Toms Run Road, Holbrook PA 15341 |
| Larry Wise | 400507398 | 298 Hero Road, New Freeport, PA 15352 |
| Roy E Antill | 400507399 | 301 Hero Road, New Freeport, PA 15352 |
| William Milesky | 400255536 | 390 Woods Road, Waynesburg, PA 15370 |
| Debra K Conrad | 500009669 | 384 Woods Road, Waynesburg, PA 15370 |
| Phillip Reece | 400255535 | 333 Woods Road, Waynesburg, PA 15370 |
| Lachrista Miller | 400253996 | 2314 Oak Forest Road, Waynesburg, PA 15370 |

**EXHIBIT Z-1**

**DOCKET NO. CP15-_____-000**

## COLUMBIA GAS TRANSMISSION, LLC

## NON-DISCLOSURE (FORM OF PROTECTIVE) AGREEMENT

Columbia Gas Transmission, LLC                )                Docket No._____-_  -____

## PROTECTIVE AGREEMENT

This Protective Agreement is made and entered into effective as of the_____day of
_____,_____("Effective Date") by and between

### *[For non-FERC use:]*
Columbia Gas Transmission, LLC ("Columbia"), is a Delaware Limited Liability Company, is a wholly owned subsidiary of the Columbia Energy Group, which in turn is a wholly owned subsidiary of NiSource Inc., herein called "Pipeline" and **[insert name of Participant]**, a **[insert state and type of corporate entity]**, herein called "Participant" (collectively Pipeline and Participant are referred to herein as the "Participants").

### *[For FERC Staff use:]*
Columbia Gas Transmission, LLC ("Columbia"), is a Delaware Limited Liability Company, is a wholly owned subsidiary of the Columbia Energy Group, which in turn is a wholly owned subsidiary of NiSource Inc., herein called "Pipeline" and the staff and agents of the Federal Energy Regulatory Commission assigned to the above-captioned docket, herein called "Participant" (collectively Pipeline and Participant are referred to herein as the "Participants").

**WHEREAS**, Pipeline filed on February 20, 2015 an application under Section 7(c) of the Natural Gas Act to replace approximately 34 miles of 20-inch pipeline located in Greene, Washington, and Allegheny counties, Pennsylvania. The replacement of the existing pipeline will enable Columbia to continue providing safe, reliable transportation service to its customer(s).  Such filing requested privileged treatment for certain information pursuant to the regulations of the Federal Energy Regulatory Commission ("Commission"); and

**WHEREAS**, the Commission's regulations require Pipeline to include as part of its request for privileged treatment a proposed Protective Agreement that governs access to the privileged information in the above-captioned docket; and

**WHEREAS**, Participant desires to obtain access to the information for which Pipeline has requested privileged treatment and has attached hereto the explanation and documentation required by 18 C.F.R. § 388.112(b)(2)(iii) of the Commission's regulations; and

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained herein, Pipeline and Participant agree as follows:

1.      This Protective Agreement shall govern the use of all Protected Materials produced by, or on behalf of, **[any Participant] [Pipeline]**, in the above-captioned docket. Notwithstanding any order terminating this proceeding, this Protective Agreement shall remain in effect until the earlier of: (i) termination by mutual agreement of the Participants; (ii) the effective date of a new Protective Order issued by a Presiding Administrative Law Judge ("Presiding Judge") (which includes the Chief Administrative Law Judge) or the Commission in trial-type hearing or settlement procedures in connection with adjudication of Pipeline's February 10, 2015 filing, as set forth in 18 C.F.R. § 388.112(b)(2)(v); or (iii) by a specific order of the Commission

terminating this Protective Agreement. To the extent there is a conflict between the terms of this Protective Agreement and a subsequent Protective Order as set forth in (ii) above, the terms of the subsequent Protective Order shall control.

2.       This Protective Agreement applies to the following two categories of materials: (A) Pipeline may designate as protected those materials which customarily are treated by Pipeline as sensitive or proprietary, which are not available to the public, and which, if disclosed freely, would subject Pipeline or its customers to risk of competitive disadvantage or other business injury; and (B) Materials which contain critical energy infrastructure information, as defined in 18 CFR§ 388.113(c)(1) ("Critical Energy Infrastructure Information").

3.       Definitions -- For purposes of this Agreement:

       (a) (1) The term "Protected Materials" means (A) materials submitted to the Commission with Pipeline's February 10, 2015 application in the above-captioned docket for which Pipeline has requested privileged treatment pursuant to the Commission's regulations and any subsequent submissions by Pipeline to the Commission in the above captioned docket for which Pipeline requests privileged treatment pursuant to the Commission's regulations; (B) materials designated by Pipeline [or Participant] as protected; (C) any information contained in or obtained from such designated materials; (D) any other materials which are made subject to this Protective Agreement by the Commission, by any court or other body having appropriate authority, or by mutual written agreement of the Participants; (E) Notes of Protected Materials; (F) copies of Protected Materials; and (G) information necessary to access any virtual site containing data requests or responses to data requests in this proceeding. Pipeline or Participant, as applicable, producing the Protected Materials shall physically mark them on each page in accordance with 18 C.F.R. § 388.112(b), including labeling each page as "PROTECTED/PRIVILEGED MATERIALS– DO NOT RELEASE". If the Protected Materials contain Critical Energy Infrastructure Information, Pipeline or Participant, as applicable, producing such information shall additionally mark on each page containing such information the words "CONTAINS CRITICAL ENERGY INFRASTRUCTURE INFORMATION - DO NOT RELEASE". Nothing in this agreement shall preclude Pipeline from claiming that materials which have been produced and which, but for their production, would have been included as Protected Materials, have been produced inadvertently and thus, despite this production, retain protected status pursuant to this Protective Agreement. The inadvertent disclosure of Protected Materials shall not constitute a waiver of their protected status.

       (2) The term "Notes of Protected Materials" means memoranda, handwritten notes, or any other form of information (including electronic form) which copies or discloses materials described in Paragraph 3(b)(1). Notes of Protected Materials are subject to the same restrictions as Protected Materials, except as specifically provided in this Protective Agreement.

       (3) Protected Materials shall not include (A) any information or document that has been filed with and accepted into the public files of the Commission, or contained in the public files of any other federal or state agency, or any federal or state court, unless the information or document has been determined to be protected by such agency or court, or (B) information that is public knowledge, or which becomes public knowledge, other than through disclosure in violation of this Protective Agreement. Protected Materials include any information or document contained in the files of the Commission that has been

designated as Critical Energy Infrastructure Information.

(b) The term "Non-Disclosure Certificate Concerning Protected Material" and "Non-Disclosure Certificate Concerning Protected Material Including Protected Material Marked as Not Available to Competitive Duty Personnel" shall mean the certificates annexed hereto which, once signed by a Reviewing Representative of Participant, will allow for access to Protected Materials and certifies Reviewing Representative's understanding that such access to Protected Materials is provided pursuant to the terms and restrictions of this Protective Agreement applicable to such materials, and that such Reviewing Representative has read the Protective Agreement and agrees to be bound by it.

(c) The term "Reviewing Representative" shall mean a person who has signed a Non-Disclosure Certificate and who is:

(1) an attorney who has made an appearance in this proceeding for Participant;

(2) attorneys, paralegals, and other employees associated for purposes of this case with an attorney described in Subparagraph (2);

(3) an expert or an employee of an expert retained by Participant for the purpose of advising, preparing for or testifying in this proceeding;

(4) a person designated as a Reviewing Representative by order of the Commission; or

(5) employees or other representatives of Participant appearing in this proceeding with significant responsibility for this docket.

4.      Protected Materials shall be made available under the terms of this Protective Agreement only to Participant and only through its Reviewing Representative(s) as provided in Paragraphs 7-9.

5.      Protected Materials shall remain available to Participant until the later of the date that an order terminating this proceeding becomes no longer subject to judicial review, or the date that any other Commission proceeding relating to the Protected Materials is concluded and no longer subject to judicial review.  If requested to do so in writing after that date, Participant shall, within fifteen days of such request, return the Protected Materials (excluding Notes of Protected Materials) to Pipeline, or shall destroy the materials, except that copies of filings, official transcripts and exhibits in this proceeding that contain Protected Materials, and Notes of Protected Materials may be retained, if they are maintained in accordance with Paragraph 6, below.  Within such time period Participant, if requested to do so, shall also submit to the Pipeline an affidavit stating that, to the best of its knowledge, all Protected Materials and all Notes of Protected Materials have been returned or have been destroyed or will be maintained in accordance with Paragraph 6.  To the extent Protected Materials are not returned or destroyed, they shall remain subject to the Protective Agreement and may not be used in any other proceeding, tribunal or case outside of the above-referenced FERC Docket.

6.      All Protected Materials shall be maintained by Participant in a secure place. Access to those materials shall be limited to those Reviewing Representatives specifically

authorized pursuant to Paragraphs 8-9. The Secretary shall place any Protected Materials filed with the Commission in a non-public file. By placing such documents in a non- public file, the Commission is not making a determination of any claim of privilege. The Commission retains the right to make determinations regarding any claim of privilege and the discretion to release information necessary to carry out its jurisdictional responsibilities. For documents submitted to Commission Trial Staff ("Staff"), Staff shall follow the notification procedures of 18 CFR § 388.112 before making public any Protected Materials.

7.      Protected Materials shall be treated as confidential by Participant and by its Reviewing Representative(s) in accordance with the Non-Disclosure Certificate(s) executed pursuant to Paragraph 9. Protected Materials shall not be used except as necessary for the conduct of this proceeding, nor shall they be disclosed in any manner to any person except a Reviewing Representative who is engaged in the conduct of this proceeding and who needs to know the information in order to carry out that person's responsibilities in this proceeding. Reviewing Representatives may make copies of Protected Materials, but such copies become Protected Materials. Reviewing Representatives may make notes of Protected Materials, which shall be treated as Notes of Protected Materials if they disclose the contents of Protected Materials.

8.      (a) If a Reviewing Representative's scope of employment includes the marketing, sale, or purchase of natural gas, natural gas transportation services, or natural gas storage service, the direct supervision of any employee or employees whose duties include the marketing, sale, or purchase of natural gas, natural gas transportation services, or natural gas storage service, the provision of consulting services to any person whose duties include the marketing, sale, or purchase of natural gas, natural gas transportation services, or natural gas storage service, or the direct supervision of any employee or employees whose duties include the marketing, sale, or purchase of natural gas, natural gas transportation services, or natural gas storage service, such Reviewing Representative may not use information contained in any Protected Materials obtained through this proceeding to give Participant, Participant's affiliates, or any competitor of Pipeline a commercial advantage.

        (b) Subject to Paragraph 22 regarding access to Protected Materials that are marked as Not Available to Competitive Duty Personnel, in the event that Participant wishes to designate as a Reviewing Representative a person not described in Paragraph 3 (c) above, the Participant shall seek agreement from the Pipeline. If an agreement is reached, that person shall be a Reviewing Representative pursuant to Paragraphs 3(c) above with respect to those materials. If no agreement is reached, Participant may submit the disputed designation to the Commission for resolution.

9.      (a) A Reviewing Representative shall not be permitted to inspect, participate in discussions regarding, or otherwise be permitted access to Protected Materials pursuant to this Protective Agreement unless that Reviewing Representative has first executed the appropriate Non-Disclosure Certificate; provided, that if an attorney qualified as a Reviewing Representative has executed such a certificate, the paralegals, secretarial and clerical personnel under the attorney's instruction, supervision or control need not do so. A copy of each Non-Disclosure Certificate shall be provided to counsel for the Pipeline prior to disclosure of any Protected Material to that Reviewing Representative.

        (b) Attorneys qualified as Reviewing Representatives are responsible for ensuring that persons under their supervision or control comply with this agreement.

10.    Any Reviewing Representative may disclose Protected Materials to any other Reviewing Representative as long as the disclosing Reviewing Representative and the receiving Reviewing Representative both have executed the appropriate Non-Disclosure Certificate and provided the Certificate to counsel for Pipeline.  In the event that any Reviewing Representative to whom the Protected Materials are disclosed ceases to be engaged in these proceedings, or is employed or retained for a position whose occupant is not qualified to be a Reviewing Representative under Paragraph 3(c), access to Protected Materials by that person shall be terminated.  Even if no longer engaged in this proceeding, every person who has executed a Non-Disclosure Certificate shall continue to be bound by the provisions of this Protective Agreement and the certification.

11.    Subject to Paragraph 18, the Commission shall resolve any disputes arising under this Protective Agreement.  Prior to presenting any dispute under this Protective Agreement to the Commission, Participants shall use their best efforts to resolve the dispute.  If Participant contests Pipeline's designation of materials as protected, it shall notify Pipeline in writing and specify the materials the designation of which is contested.

12.    All documents reflecting Protected Materials, including the portion of any application, contract, pleading, exhibits, transcripts, briefs and other documents which contain or refer to Protected Materials, to the extent they will be filed with the Commission, shall be filed

[in accordance with 18 C.F.R. § 388.112(b), in either an electronic or paper filing. To the extent paper filing is used, documents shall be filed in sealed envelopes or other appropriate containers endorsed to the effect that they are sealed pursuant to this Protective Order.  Such documents shall be marked "PROTECTED MATERIALS" and shall be filed under seal and served under seal upon the Presiding Judge and all Reviewing Representatives who are on the service list.  Such documents containing Critical Energy Infrastructure Information shall be additionally marked "CONTAINS CRITICAL ENERGY INFRASTRUCTURE INFORMATION DO NOT RELEASE."]

[in sealed envelopes or other appropriate containers endorsed to the effect that they are sealed pursuant to this Protective Order.  Such documents shall be marked "PROTECTED MATERIALS" and shall be filed under seal and served under seal upon the Presiding Judge and all Reviewing Representatives who are on the service list.  Such documents containing Critical Energy Infrastructure Information shall be additionally marked "CONTAINS CRITICAL ENERGY INFRASTRUCTURE INFORMATION DO NOT RELEASE"]

For anything filed under seal, redacted versions or, where an entire document is protected, a letter indicating such, will also be filed with the Commission and served in accordance with Commission regulations.  Counsel shall take all reasonable precautions necessary to assure that Protected Materials are not distributed to unauthorized persons.

13.    Except in cases where release is ordered sooner by the Commission, Protected Materials that have been requested pursuant to this Protective Agreement will be provided within five days receipt of the request satisfying 18 C.F.R. § 388.112(b)(2)(iii).  If Pipeline files an objection to such request with the Commission, Pipeline is under no obligation to disclose the requested Protected Materials until ordered by the Commission or a decisional authority.

14.    Nothing in this Protective Agreement shall be construed as precluding Pipeline or

Participant from objecting to the use of Protected Materials on any legal grounds.

15.     Nothing in this Protective Agreement shall preclude Participant from requesting that the Commission, or any other body having appropriate authority, find that this Protective Agreement should not apply to all or any materials previously designated as Protected Materials pursuant to this Protective Agreement. The Commission may alter or amend this Protective Agreement as circumstances warrant at any time during the course of this proceeding. Participants may amend this Protective Agreement at any time by written mutual agreement without seeking Commission approval, unless such amendment is otherwise specifically prohibited by law.

16.     Both Pipeline and Participant have the right to seek changes in this Protective Agreement as appropriate from the Commission.

17.     If the Commission finds at any time in the course of this proceeding that all or part of the Protected Materials need not be protected, those materials shall, nevertheless, be subject to the protection afforded by this Protective Agreement for five (5) business days from the date of issuance of the Commission's determination. Pipeline reserves its rights to seek additional administrative or judicial remedies after the Commission's decision respecting Protected Materials or Reviewing Representatives, or the Commission's denial of any appeal thereof. The provisions of 18 CFR §§ 388.112 and 388.113 shall apply to any requests under the Freedom of Information Act (5 U.S.C. § 552) for Protected Materials in the files of the Commission.

18.     Nothing in this Protective Agreement shall be deemed to preclude any Participant from independently seeking through discovery in any other administrative or judicial proceeding information or materials produced in this proceeding under this Protective Agreement.

19.     Neither Pipeline nor Participant waives the right to pursue any other legal or equitable remedies that may be available in the event of actual or anticipated disclosure of Protected Materials.

20.     The contents of Protected Materials or any other form of information that copies or discloses Protected Materials shall not be disclosed to anyone other than in accordance with this Protective Agreement and shall be used only in connection with this (these) proceeding(s).

21.     Pipeline shall physically mark with the words "Not Available to Competitive Duty Personnel," any Protected Materials that Pipeline believes in good faith would, if freely disclosed, subject Pipeline, or third party, to risk of competitive disadvantage or other concrete business injury if provided to all Reviewing Representatives. Such information may include, but is not limited to (a) non-public business development, acquisition, or marketing data, plans or activities, (b) non-public strategic business or financial plans or activities, or (c) negotiations of services, prices and rates, the public disclosure of which such Participant in good faith believes would competitively harm the disclosing Participant or third party (hereafter "Market Sensitive Information"). Market Sensitive Information should customarily be treated by the providing Participant as sensitive or proprietary and not be available to the public. Any challenge to such a designation may be made as provided in this Protective Agreement for challenges to designations of Protected Materials.

22.    Notwithstanding the foregoing, a Participant may disclose Protected Materials when required in order for the Participant to comply with any statute, law, rule or regulation of, or any judicial order, administrative interpretation or order imposed by, any United. States federal, state or local government or any department, subdivision or agency, administrative body, court or tribunal (a "Permitted Disclosure"). Provided, however, Participant is required, as soon as reasonably practicable after receipt of any request, subpoena or other process requesting disclosure of Protected Materials, and prior to any Permitted Disclosure, provide Pipeline with notice of the request (and a copy of the request when such request is provided to Participant in writing) in order to afford the Pipeline the maximum opportunity to evaluate the request and seek an appropriate protective order or other remedy to prevent or narrow the disclosure, or to ensure that information will continue to be treated in as confidential a manner as possible. In the event such protective order or other remedy is not obtained by Pipeline, the Participant may disclose only that portion of the Protected Materials which it is legally required to disclose, and shall provide Pipeline with a copy of the Permitted Disclosure at least 48 hours in advance of submission by Participant to the relevant tribunal, administrative or judicial body in order to allow Pipeline to review and comment upon such disclosure.

23.    Solely with respect to Protected Materials that have been marked "Not Available to Competitive Duty Personnel" and information derived therefrom, a Reviewing Representative may not be any employee or agent of Participant whose duties include, on a consistent and regular basis, (1) the marketing, sale, or purchase of natural gas, natural gas transportation services, or natural gas storage services (i) on Pipeline or (ii) on a natural gas pipeline or storage facility in any region in which Pipeline operates or (iii) for a shipper or prospective shipper on a natural gas pipeline or storage facility in any region in which Pipeline operates; (2) management responsibility regarding, or the supervision of any employee whose duties include, the marketing, sale, or purchase of natural gas, natural gas transportation services, or natural gas storage services (i) on Pipeline or (ii) on a natural gas pipeline or storage facility in any region in which Pipeline operates or (iii) for a shipper or prospective shipper on any pipeline or storage facility in any region in which Pipeline operates; (3) the provision of consulting services regarding the marketing, sale, or purchase of natural gas, natural gas transportation services, or natural gas storage services for a pipeline or storage facility in any region in which Pipeline operates or for a shipper or prospective shipper on Pipeline or any pipeline or storage facility in any region in which Pipeline operates; or (4) management responsibility regarding other strategic business activities in which use of Market Sensitive Information could be reasonably expected to cause competitive harm to Pipeline or third party (collectively, "Competitive Duties"). Notwithstanding the above, in-house and/or outside counsel for Participant may serve as a Reviewing Representative; provided, however, that in-house and/or outside counsel shall not disclose any Market Sensitive Information to competitive Duty Personnel. In the event that (a) any person who has been a Reviewing Representative subsequently is assigned to perform any Competitive Duties, or (b) previously available Protected Materials are changed to "Not Available to Competitive Duty Personnel," a Reviewing Representative involved in Competitive Duties shall have no access to Pipeline's Protected Materials that are marked "Not Available to Competitive Duty Personnel" or information derived therefrom. Such Reviewing Representative shall immediately dispose of Pipeline's Protected Materials in his/her possession that are marked "Not Available to Competitive Duty Personnel" and information derived therefrom and shall continue to comply with the requirements of the Non-Disclosure Certificate Concerning Protected Material, Including Protected Material Marked As Not Available to Competitive Duty Personnel, and this Protective Agreement with respect to any Protected Materials to which such person previously had access. Notwithstanding the foregoing, with respect to Protected Materials that

have been marked "Not Available to Competitive Duty Personnel" and information derived therefrom, a Reviewing Representative may not be an employee of a FERC-regulated natural gas pipeline or storage facility in any region in which Pipeline operates.  Reviewing Representatives of such a pipeline or storage facility, with respect to Protected Materials that have been marked "Not Available to Competitive Duty Personnel", shall be limited to outside counsel and/or consultants, provided such individuals are not engaged in Competitive Duties, as defined above, on behalf of such pipeline or storage facility.

Notwithstanding the foregoing, a person who otherwise would be disqualified as Competitive Duty Personnel may serve as a Reviewing Representative upon agreement of Pipeline or, in the absence of such agreement, upon entry of an order of the Commission authorizing such person to serve as a Reviewing Representative.  Any request for an agreement or order under the preceding sentence shall be subject to the following conditions: (i) Participant must certify in writing to Pipeline that Participant's ability to participate effectively in this proceeding would be prejudiced if it was unable to rely on the assistance of the particular Reviewing Representative; (ii) Participant must identify by name and job title the particular Reviewing Representative required and must describe the person's duties and responsibilities; (iii) the Participant claiming such prejudice must acknowledge in writing to Pipeline that access to the Protected Materials which are marked as Not Available to Competitive Duty Personnel shall be restricted only to such access necessary for the adjudication of this proceeding, absent prior written consent of Pipeline or authorization of the Commission with opportunity for Pipeline to seek review of such decision as provided in this agreement; (iv) Participant must acknowledge in writing that any other use of Protected Materials which are Not Available to Competitive Duty Personnel shall constitute a violation of this Protective Agreement; and (v) prior to having access to any Protected Materials which are marked as Not Available to Competitive Duty Personnel, the Competitive Duty Personnel who is authorized to act as a Reviewing Representative must execute and deliver to Pipeline a Non-Disclosure Certificate Concerning Protected Material, Including Protected Material Marked As Not Available to Competitive Duty Personnel acknowledging his or her familiarity with the contents of this Protective Agreement and the particular restrictions set forth in this paragraph regarding such Protected Materials.  Such agreement by Pipeline shall not be unreasonably withheld, delayed or conditioned.  Materials marked as "Not Available to Competitive Duty Personnel" shall be returned or destroyed at the conclusion of this proceeding as otherwise provided in this Protective Agreement.

24.     If Pipeline believes that Protected Materials that it previously disclosed to Reviewing Representative(s) contain Market Sensitive Information, public disclosure of which would competitively harm Pipeline, and should be treated as if such Protected Materials had been labeled "Not Available to Competitive Duty Personnel," Pipeline must notify Participant.  Such notice must specifically identify the Protected Materials that contain such Market Sensitive Information, make an informal showing of why such information should be subject to the restrictions applicable to Protected Materials labeled "Not Available to Competitive Duty Personnel," and must seek Participant's consent to treatment of the subject materials as "Not Available to Competitive Duty Personnel."  Such consent shall not be unreasonably withheld, delayed or conditioned.  If no agreement is reached concerning the designation of previously distributed Protected Material as "Not Available to Competitive Duty Personnel," Pipeline may submit the dispute to the Commission.  In the event that Pipeline's previously distributed Protected Material is subsequently designated as "Not Available to Competitive Duty Personnel," it will be the responsibility of Participant to ensure compliance with this Protective Agreement after the additional designation; Pipeline will not be responsible for redistributing

or re-labeling the affected Protected Materials.

25.     Injunctive Relief.  Participant agrees that, in addition to whatever other remedies may be available to Pipeline under applicable law, Pipeline shall be entitled to obtain injunctive relief with respect to any actual or threatened violation of this Agreement by Participant or any third party. Participant agrees that it shall bear all costs and expenses, including reasonable attorneys' fees, that may be incurred by Participant in enforcing the provisions of this paragraph, only if Pipeline prevails in the litigation.


**Columbia Gas Transmission, LLC**

**AGREED TO AND ACCEPTED THIS   _ DAY OF_____, 20[XX]**

**By: _____**

**Name: _____**

**Title: _____**


**[NAME OF PARTICIPANT]**

**AGREED TO AND ACCEPTED THIS _ DAY OF_____, 20[XX]**

**By: _____**

**Name: _____**

**Title: _____**

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

Columbia Gas Transmission, LLC                    Docket No. CP15-_____-

NON-DISCLOSURE CERTIFICATE

CONCERNING PROTECTED MATERIALS

I hereby certify my understanding that access to Protected Materials is provided to me pursuant to the terms and restrictions of the Protective Agreement in this proceeding, that I have been given a copy of and have read the Protective Agreement, and that I agree to be bound by it. I understand that the contents of the Protected Materials, any notes or other memoranda, or any other form of information that copies or discloses Protected Materials shall not be disclosed to anyone other than in accordance with that Protective Agreement. I acknowledge that a violation of this certificate constitutes a violation of an order of the Federal Energy Regulatory Commission.

By: _____

Printed Name: _____

Title: _____

Representing: _____

Email Address: _____

Date: _____

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

Columbia Gas Transmission, LLC

Docket No. CP15-
NON-DISCLOSURE

CERTIFICATE
CONCERNING PROTECTED MATERIAL AND
PROTECTED MATERIAL MARKED AS
NOT AVAILABLE TO COMPETITIVE DUTY PERSONNEL

I hereby certify my understanding that access to Protected Materials is provided to me pursuant to the terms and restrictions of the Protective Agreement in this proceeding, that I have been given a copy of and have read the Protective Agreement, and that I agree to be bound by it. I understand that the contents of the Protected Materials, including Protected Materials that are marked as "Not Available to Competitive Duty Personnel", any notes or other memoranda, or any other form of information that copies or discloses Protected Materials shall not be disclosed to anyone other than in accordance with that Protective Agreement. I acknowledge that a violation of this certificate constitutes a violation of an order of the Federal Energy Regulatory Commission.

By: _____

Printed Name: _____

Title: _____

Representing: _____

Email Address: _____

Date: _____

# EXHIBIT 3

146 FERC ¶ 61,075
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Cheryl A. LaFleur, Acting Chairman;
                        Philip D. Moeller, John R. Norris,
                        and Tony Clark.

Columbia Gas Transmission, LLC                    Docket No.  CP13-478-000

ORDER ISSUING CERTIFICATE

(Issued February 7, 2014)

1.      On May 10, 2013,[1] Columbia Gas Transmission, LLC (Columbia) filed an
application under sections 7(b) and (c) of the Natural Gas Act (NGA)[2] and part 157,
Subpart A of the Commission's regulations[3] for a certificate of public convenience and
necessity authorizing the replacement and expansion of existing pipeline facilities located
in Greene and Washington Counties, Pennsylvania, and the replacement and expansion of
horsepower at Columbia's existing Waynesburg Compressor Station in Greene County,
Pennsylvania (Line 1570 Project).  Columbia states that the proposal will result in
additional capacity sufficient to provide an additional 99,000 dekatherms (Dth) per day of
firm transportation service.

2.      The Commission grants Columbia's requested authorizations subject to the
conditions described below.

I.      **Background**

3.      Columbia,[4] a Delaware limited liability company with its principal place of
business in Houston, Texas, is a natural gas company[5] that transports natural gas and

_____

[1] Columbia supplemented its application on June 4 and 28 and July 30, 2013.

[2] 15 U.S.C. § 717f(b), (c) (2012).

[3] 18 C.F.R. pt. 157, Subpart A (2013).

[4] Columbia is a is a wholly owned subsidiary of the Columbia Energy Group,
which in turn is a wholly owned subsidiary of NiSource Inc.

[5] *See* 15 U.S.C. § 717a(6) (2012).

operates underground storage fields in interstate commerce in Delaware, Kentucky, Maryland, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Virginia and West Virginia.

4.        Columbia states that it has developed a system-wide modernization program to address its aging infrastructure.[6]  The modernization program identifies and prioritizes high risk, vulnerable portions of Columbia's system needing upgrades in order to meet emerging safety regulations or to improve service reliability.  Columbia states that the Line 1570 Project is, in part, a part of this program.

## II.    **Proposal**

5.        Columbia proposes to replace approximately 18.52 miles of high pressure, uncoated, bare steel, 20-inch diameter pipeline on Line 1570, between Columbia's Waynesburg Compressor Station in Greene County and its Redd Farm Compressor Station in Washington County, Pennsylvania, with new, 24-inch diameter, coated and wrapped steel pipeline.[7]  Columbia also proposes to replace three of five existing 1,080 horsepower (hp) Solar Saturn turbine-driven compressor units at the Waynesburg Compressor Station with a single new 4,700 hp Solar Centaur 40 turbine-driven compressor unit, increasing the total station horsepower by 1,460 hp.[8]

6.        Columbia states that Line 1570 is a bi-directional (north/south) mainline that is used, along with other pipelines, to meet the gas requirements of the Pittsburgh metropolitan area.  Columbia also states that replacing the existing pipe and older compressors with a larger diameter pipe and additional horsepower will allow it to combine a reliability and replacement project under its modernization program[9] with a

---

[6] On January 24, 2014, the Commission approved a settlement in Docket No. RP12-1021-000, which established the basis for the modernization program, including a mechanism for the recovery of costs associated with the program.  *Columbia Gas Transmission, LLC*, 142 FERC ¶ 61,062 (2013).

[7] The original pipeline to be replaced on Line 1570 was installed in 1947 and 1948 *Manufacturers Light and Heat Co.*, 5 FPC 707 (1946).

[8] The Waynesburg Compressor Station was originally authorized for construction in 1968, *Manufacturers Light and Heat Co.*, 39 FPC 614 (1968).  Two compressor units were installed as a part of the initial authorization and three more were installed between 1968 and 1970, *Manufacturers Light and Heat Co.*, 39 FPC 329 (1968) and *Manufacturers Light and Heat Co.*, 43 FPC 919 (1970).  The current total operating capacity at the Waynesburg Compressor Station is 5,400 hp.

[9] Columbia states that the age and condition of the existing facilities would call for replacement in any event.

project that will enable it to provide additional transportation service to the market. Columbia notes that to provide the full 99,000 Dth per day of firm Line 1570 Project expansion service, it also needs to utilize horsepower at the new Redd Farm Compressor Station proposed as part of its Smithfield III Expansion project.[10]

7.       Columbia plans to offset the new pipeline from the existing pipeline to avoid removing the existing pipeline from service during construction.  However, short-duration outages may be required to tie in new facilities, or to use lift-and-lay construction in areas where offset construction is not feasible.  Most (about 80 percent) of the new pipeline would be collocated within the existing rights of way and the majority of the old pipeline will be abandoned in place.  Columbia will retain its existing easements on property where pipe is proposed for abandonment in place.

8.       Columbia states that the new replacement unit at its Waynesburg Compressor Station will produce less noise and use less fuel than the old units it is replacing.  In addition, the new unit's efficient design will improve air emissions while generating more horsepower.  However, in order to enhance reliability, Columbia proposes to leave the compressor units being replaced at the Waynesburg Compressor Station in place, converting them from base load use to standby facilities.[11]

9.       As noted above, Columbia proposes to provide up to 99,000 Dth per day of additional firm transportation service utilizing the additional capacity resulting from the expansion aspect of the Line 1570 Project.  Columbia estimates the total cost of the Line 1570 Project to be approximately $121.7 million.  Columbia proposes to allocate approximately $17.7 million of total costs to the expansion component of the project. Columbia proposes to utilize its existing Rate Schedule FTS rates, including all applicable charges and surcharges, as initial recourse rates for expansion service on the project.

---

[10] *See Columbia Gas Transmission, LLC*, 145 FERC ¶ 61,257 (2013) (approving Columbia's Smithfield III Expansion project in Docket No. CP13-477-000 authorizing Columbia to construct and operate a 9,400 hp compressor station in Washington County, Pennsylvania (Redd Farm Compressor Station) and to add compression to its existing Glenville Compressor Station in Gilmer County, West Virginia).  Of the 9,400 hp to be installed at the Redd Farm Compressor Station, 6,400 hp will be used to increase capacity on Line 1570 for shippers on the Line 1570 Project.  Columbia will recover $10,049,170 of the $30,151,639 cost of the Redd Farm Compressor Station from Line 1570 Project shippers.

[11] The horsepower of the standby facilities will not be reflected in the certificated horsepower of the Waynesburg Compressor Station.

10.     On May 17, 2013, Columbia executed a precedent agreement with Range Resources – Appalachia, LLC (Range Resources) for 85,000 Dth per day of expansion service.  Subsequently Columbia conducted an open season and reverse open season between May 17 and May 24, 2013, for the remaining 14,000 Dth per day of expansion capacity.  Columbia received no offers from its existing shippers to turn back capacity.

11.     There were two successful bidders for the remaining 14,000 Dth per day:  Range Resources and Rice Drilling B, LLC (Rice Drilling).  Each party received 50 percent of its bid, or 7,000 Dth per day each.  Columbia finalized a revised precedent agreement with Range Resources, and executed a new precedent agreement with Rice Drilling. Both shippers have elected to pay a negotiated rate.

### III.    Procedural Issues

12.     Notice of Columbia's application was published in the *Federal Register* on June 4, 2013 (78 Fed. Reg. 33,400).  The parties listed in Appendix B of this order have filed timely, unopposed motions to intervene.[12]  Antero Resources Appalachian Corporation filed comments in support of the application.  The City of Charlottesville, Virginia, the City of Richmond, Virginia, Indicated Shippers,[13] and Washington Gas Light Company filed comments to the application regarding rate issues to which Columbia filed an answer.  We address the comments in the rates section of this order below.

13.     Arthur M. and Beverly F. Wilson (the Wilsons), landowners affected by this proposal, protested the application on environmental grounds and with respect to issues related to the existing right-of-way easement on their property.  On August 15, 2013, Columbia filed a response addressing the Wilsons' environmental and easement concerns.  The Environmental Assessment (EA) for this project and the environmental section of this order address the environmental issues raised by the Wilsons.[14]

---

[12] Timely, unopposed motions to intervene are granted by operation of Rule 214(c) of the Commission's Rules of Practice and Procedure.  *See* 18 C.F.R. § 385.214(c) (2013).

[13] The Indicated Shippers are BP Energy Company, Chevron U.S.A. Inc., ConocoPhillips Company, ExxonMobil Gas & Power Marketing Company, a division of Exxon Mobil Corporation, Hess Corporation, Interstate Gas Supply, Inc. and Noble Energy, Inc.  Indicated Shippers have all separately moved to intervene in this proceeding.

[14] The Wilsons raised issues related to Water Resources, which are discussed in section B.2 of the EA, Soil Resources, discussed in section B.1, Fisheries, Vegetation and Wildlife, discussed in section B.3, and Cultural Resources, discussed in section B.5.

Docket No. CP13-478-000                                               - 5 -

14.     As to the questions regarding the easement, Columbia provided evidence to the Wilsons demonstrating that Columbia is the successor in interest to Manufacturers Light and Heat Company (Manufacturers), which is one party to a 1946 easement between Manufactures and Charles and Hazel Hackney, the predecessors in title to the Wilsons' land.  The Wilsons state that under that 1946 easement they are entitled to compensation from Columbia if Columbia installs a second pipeline on their land.  They argue that Columbia, as successor in interest to Manufacturers, is bound by the terms of the easement.

15.     Issues related to what rights Columbia may have to utilize the Wilson's property under the current easement and whether or not additional compensation or a new conveyance may be required for additional uses are beyond the jurisdiction of this Commission.  Such issues may be addressed under state law in a court of competent jurisdiction.[15]

16.     The Wilsons also maintain that authorizing the project is not in the public interest because, they assert, the purpose of the project is to financially enhance a small segment of the public at the expense of the general public.  We disagree.  Section 1(a) of the NGA states that "the business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest, and that Federal regulation in matters relating to the transportation of natural gas and the sale thereof in interstate and foreign commerce is necessary in the public interest."[16]  Section 7(e) of the NGA provides that the Commission shall issue a certificate of public convenience and necessity to any qualified applicant authorizing it to construct and operate facilities to provide the interstate transportation of natural gas if the Commission finds that the proposal "is or will be required by the present or future public convenience and necessity."[17]  For the reasons set forth in the Discussion section of this order, we find that Columbia's proposal in this proceeding is required by the public convenience and necessity.

17.     The Wilsons also request a formal hearing.  Section 7 of the NGA provides for a hearing when an applicant seeks a certificate of public convenience and necessity but does not require that all such hearings be formal trial-type hearings.[18]  An evidentiary trial-type hearing is necessary only where material issues of fact are in dispute and cannot be resolved on the basis of the written record.[19]  We find that no party has raised any

---

[15] *Earle and Julie Smith*, 90 FERC ¶ 61,034 (2000).

[16] 15 U.S.C. § 717(a) (2012).

[17] *Id.* § 717f(e).

[18] *See* 18 C.F.R. § 385.213(a)(2) (2013).

[19] *See id.* § 385.101(e).

material issues of fact that cannot be resolved on the written record.  Therefore, we find no need for an evidentiary trial-type hearing and will deny the request.

## IV.    Discussion

18.     Since Columbia seeks to abandon, construct, and operate facilities used in the transportation of natural gas in interstate commerce subject to the jurisdiction of the Commission, the proposal is subject to the requirements of subsections (b), (c), and (e) of section 7 of the NGA.[20]

### A.    Certificate Policy Statement

19.     The Certificate Policy Statement provides guidance for evaluating proposals for certificating new construction.[21]  The Certificate Policy Statement established criteria for determining whether there is a need for a proposed project and whether the proposed project will serve the public interest.  The Certificate Policy Statement explained that in deciding whether to authorize the construction of major new pipeline facilities, the Commission balances the public benefits against the potential adverse consequences.  The Commission's goal is to give appropriate consideration to the enhancement of competitive transportation alternatives, the possibility of overbuilding, subsidization by existing customers, the applicant's responsibility for unsubscribed capacity, the avoidance of unnecessary disruptions of the environment, and the unneeded exercise of eminent domain in evaluating new storage and pipeline construction.

20.     Under this policy, the threshold requirement for pipelines proposing new projects is that the pipeline must be prepared to financially support the project without relying on subsidization from its existing customers.  The next step is to determine whether the applicant has made efforts to eliminate or minimize any adverse effects the project might have on the applicant's existing customers, existing pipelines in the market and their captive customers, or landowners and communities affected by the route of the new pipeline.  If residual adverse effects on these interest groups are identified after efforts have been made to minimize them, the Commission will evaluate the project by balancing the evidence of public benefits to be achieved against the residual adverse effects.  This is essentially an economic test.  Only when the benefits outweigh the adverse effects on economic interests will the Commission proceed to complete the environmental analysis where other interests are considered.

---

[20] 15 U.S.C. §§ 717f (b)(c) and 717f(e) (2012).

[21] *Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶ 61,227 (1999), *clarifed*, 90 FERC ¶ 61,128, *further clarified*, 92 FERC ¶ 61,094 (2000) (Certificate Policy Statement).

21.     As stated, the threshold requirement is that the applicant must be prepared to financially support the project without relying on subsidization from its existing customers.  The Certificate Policy Statement provides that it is not a subsidy for existing customers to pay for projects designed to replace existing capacity or improve the reliability or flexibility of existing service.[22]  To the extent that the proposed Line 1570 Project will serve to replace existing pipelines that are deteriorated due to age, enabling Columbia to meet emerging safety regulations, maintain existing levels of service and/or provide needed levels of enhanced reliability for existing services, increasing the rates of existing customers to cover associated costs does not constitute a subsidy under the Certificate Policy Statement.  Columbia states that it has allocated approximately $17.7 million of the Line 1570 Project's capital costs to the expansion component of the project.  That leaves approximately $104 million dollars of capital costs which is being incurred to maintain and/or improve the service of existing customers, and thus, can be passed through to existing customers without running afoul of the no-subsidy requirement.[23]

22.     With respect to the costs Columbia proposes to allocate to the expansion project, as discussed below, an incremental rate calculated to recover those costs would be less than Columbia's applicable system rate for service.  Accordingly, and consistent with Commission precedent,[24] Columbia proposes to establish its existing system rates as the initial recourse rates for the Line 1570 Project expansion services.  We find approval of this proposal will prevent subsidization of the expansion service by existing customers.

23.     The Line 1570 Project facilities are designed to both maintain and enhance the reliability of service to Columbia's existing customers and to enable Columbia to provide additional, incremental service for new shippers.  The proposal should have no adverse effect on service to Columbia's existing firm customers.  In addition, no pipelines, or their captive customers, have filed adverse comments regarding Columbia's proposal.  Thus, we find that the project will not adversely affect Columbia's existing customers or other pipelines and their customers.

24.     We further find that Columbia has taken steps to minimize any adverse impacts on landowners and communities that might be affected by its project.  The replacement and expansion of Columbia's existing Line 1570 will take place within the existing rights-of-

---

[22] Certificate Policy Statement, 88 FERC ¶ 61,227 at n.12.

[23] We note, however, as is discussed below, that the Modernization Settlement approved by the Commission in Docket No. RP12-1021-000, provides that the precise allocation of costs for projects with both expansion and modernization components will be addressed in Columbia's annual capital cost recovery mechanism proceeding.

[24] *See Millennium Pipeline Company, L.L.C.*, 145 FERC ¶ 61,007, at P 30 (2013).

way. Additionally, installation of the new compressor unit at the existing Waynesburg Compressor Station will not require enlarging the existing facilities' footprint, will be quieter, and will improve air emissions.

25.     Columbia's project will enable Columbia to provide an additional 99,000 Dth per day of firm transportation service to two shippers that have signed precedent agreements for the service. Based on the benefits the project will provide, the minimal adverse impacts on Columbia's existing customers, other pipelines and their captive customers, and landowners and surrounding communities, we find that Columbia's project is consistent with the Certificate Policy Statement and required by the public convenience and necessity, as conditioned in this order.

### B.     Rates

#### 1.     Initial Recourse Rate

26.     Columbia proposes to utilize its existing Rate Schedule FTS rates, including all applicable charges, and surcharges, as the initial recourse rates for expansion service from the Line 1570 Project. Columbia states that it allocated approximately $17.7 million of the Line 1570 Project's capital costs to the expansion component of the project. The estimated incremental monthly firm reservation rate for the expansion service is $2.207 per Dth per day.[25] This rate is lower than Columbia's currently-effective Rate Schedule FTS base reservation rate of $5.262 per Dth/day. Since the estimated incremental rate is less than Columbia's existing rate, the Commission will approve the use of Columbia's existing system rates as the initial recourse rates for the new capacity to prevent subsidization of the expansion service by existing shippers.

27.     Columbia also proposes to charge expansion shippers its generally-applicable system fuel and lost and unaccounted-for retention. Based on engineering data that Columbia used to design the project, the Commission has determined that Columbia's fuel retention would remain the same and that existing shippers will not subsidize or be adversely affected by the fuel charges resulting from this project. The Commission, therefore, approves Columbia's proposal to charge its generally applicable system fuel and lost and unaccounted-for retention.

#### 2.     Rolled in Rate Determination

28.     Columbia seeks a predetermination that it can roll the costs of the expansion component of the project into its existing rates in a future NGA section 4 rate

---

[25] This value is derived by dividing the first year cost of service of $2,621,560 by the total annual firm design capacity of 1,188,000 Dth (99,000 Dth per day times 12 months).

proceeding.[26]  In support of its request, Columbia provides in Exhibit N of its application a three-year statement of revenues, expenses, and income, as well as a three-year cost-of-service analysis.

29.     Columbia has entered into binding precedent agreements with Range Resources and Rice Drilling.  From November 1, 2014 through October 31, 2015, the agreements provide for 64,000 Dth/day of project capacity.  From November 1, 2015 through October 31, 2024, the agreements provide for the full subscription of 99,000 Dth/day of project capacity.  These precedent agreements provide that the shippers will pay negotiated rates, which are greater than the proposed recourse rates.  In such instances, when the Commission considers a request for rolled-in rate treatment, the Commission has generally compared project costs with the revenues that would be generated if all project services under contract were provided at the maximum recourse rate.  Here, we have calculated Columbia's projected revenue for the first year of the project to be $4,041,216 and $6,251,256 for the following year.[27]  Therefore, the projected revenues would exceed the projected cost of service for the first year by $1,419,656 and $3,712,733 in the second year.  We find, absent changed circumstances, rolled-in treatment of the proposed costs would not require subsidies from existing customers.

### 3.     **Comments**

30.     On June 18, 2013, comments were filed by The Cities of Charlottesville, Virginia and Richmond, Virginia, Washington Gas Light Company, and Indicated Shippers (collectively, Commenters) in regard to Columbia's cost-recovery mechanism adopted under its Modernization Settlement with the Commission.[28]  The Commenters claim that the Modernization Settlement seeks to avoid the necessity of shipper participation in numerous individual section 7(c) and prior notice blanket certificate proceedings to address issues related to the allocation of costs between an expansion and the capital cost recovery mechanism (CCRM).  Those issues, the Commenters assert, are to be addressed in annual CCRM proceedings.  The Commenters request that the Commission refrain

---

[26] Columbia intends to recover the replacement component of its project consistent with the capital cost recovery mechanism (CCRM) adopted under its Modernization Settlement with the Commission.  *See Columbia Gas Transmission, LLC,* 142 FERC ¶ 61,062 (2013) (Modernization Settlement).

[27] Revenues were calculated utilizing the actual contracted capacity of 64,000 Dth per day for the first year and 99,000 Dth per day for the following year, and the currently effective maximum Rate Schedule FTS recourse reservation rate of $5.262 per Dth per day.

[28] *See Columbia Gas Transmission, LLC,* 142 FERC ¶ 61,062 (2013) (Modernization Settlement).

from making any statements or rulings that would affect implementation of the Modernization Settlement.

31.     The Commission clarifies that it is not making a determination on the allocation of costs to be recovered pursuant to the Modernization Settlement in this proceeding.  As the Commenters correctly note, the Modernization Settlement provides that the allocation of costs between an expansion project and the modernization program will be addressed in individual CCRM proceedings.  However, if there is a significant change in the allocation of costs to the Line 1570 Project services in a future CCRM proceeding, the parties will be able to re-examine the Commission's predetermination of rolled-in pricing based on a change in circumstances.

### 4.     Record Keeping

32.     To aid the parties in their review of Columbia's Line 1570 Project costs in future CCRM proceedings and any challenge to rolled-in pricing of the project's costs, the Commission will require Columbia to keep separate books and accounting of costs attributable to the new facilities.  Further, the books should be maintained with applicable cross-reference as required by section 154.309 of the Commission regulations.  This information must be in sufficient detail so that the data can be identified in Statements G, I, and J in any future NGA section 4 or 5 rate case and provided consistent with Order No. 710 on incremental facilities.[29]

### 5.     Service Agreements

33.     Columbia states that it will provide service to its customers under negotiated rate agreements pursuant to the negotiated rate authority in its General Terms and Conditions.[30]  Columbia must file either its negotiated rate agreements or tariff records setting forth the essential terms of the agreements associated with the project, in accordance with the Alternative Rate Policy Statement[31] and the Commission's

---

[29] *Revisions to Forms, Statements, and Reporting Requirements for Natural Gas Pipelines*, Order No. 710, FERC Stats. & Regs. ¶ 31,267, at P 23 (2008).

[30] *See* Columbia Gas Transmission, LLC, FERC NGA Gas Tariff, Baseline Tariffs, Gen. Terms & Conditions, Negotiated Rates, 0.0.0.

[31] *Alternatives to Traditional Cost-of-Service Ratemaking for Natural Gas Pipelines; Regulation of Negotiated Transportation Services of Natural Gas Pipelines*, 74 FERC ¶ 61,076, *order granting clarification*, 74 FERC ¶ 61,194 (1996).

negotiated rate policies.[32]  Columbia must file the negotiated rate agreements or tariff records at least 30 days, but not more than 60 days, before the in-service date of the proposed facilities.

## C.     Environmental Analysis

34.     On July 2, 2013, the Commission issued a *Notice of Intent to Prepare an Environmental Assessment* (NOI).  The NOI was published in the *Federal Register*[33] and mailed to interested parties including federal, state, and local officials; agency representatives; conservation organizations; potentially interested Indian tribes; local libraries and newspapers; and affected property owners, including landowners within 0.5 mile of Columbia's proposed compressor station upgrade.

35.     We received five comments in response to the NOI from the Clean Air Council (CAC), two landowners (the Wilsons), and two interested parties.  Primary issues raised concerned potential contamination from the abandonment of the existing Line 1570, as well as construction impacts on waterbodies, wildlife, and cultural resources.

36.     The CAC raised general concerns about cumulative impacts and natural gas production and its effect on climate change, and the environmental review of the Line 1570 Project, and Columbia's Smithfield III Expansion Project as separate projects.  The CAC also:  1) states that an environmental impact statement (EIS) is necessary; 2) identifies supposed deficiencies in Columbia's treatment of air quality in its application; 3) advocates the need for further air modeling; and 4) suggests that alternative equipment and pollution controls may reduce the impacts of the project.

37.     To satisfy the requirements of the National Environmental Policy Act of 1969 (NEPA),[34] our staff prepared an EA for Columbia's proposal.  The analysis in the EA addressed geology, soils, water resources, wetlands, vegetation, fisheries, wildlife, threatened and endangered species, land use, recreation, visual resources, cultural resources, air quality, noise, safety, cumulative impacts, and alternatives.  The EA was placed in the public record for this proceeding on November 22, 2013, and addressed all substantive comments received during the public scoping period, as summarized below. There were no comments filed on the EA.

---

[32] *Natural Gas Pipelines Negotiated Rate Policies and Practices; Modification of Negotiated Rate Policy*, 104 FERC ¶ 61,134 (2003), *order on reh'g and clarification*, 114 FERC ¶ 61,042, *dismissing reh'g and denying clarification*, 114 FERC ¶ 61,304 (2006).

[33] 78 Fed. Reg. 41,393 (July 10, 2013).

[34] 42 U.S.C. §§ 4321-4347 (2012).

38.     Regarding the contamination concern with the abandoned pipeline, the EA states that the existing Line 1570 will be disconnected from all sources and supplies of natural gas and purged of all liquids and contaminants which will then be disposed of in accordance with applicable regulations.  Any open ends or other openings made in the existing pipeline during abandonment procedures will be sealed.[35]  As a result, the abandoned pipeline will not be a source of soil or water contamination.

39.     The Wilsons also expressed concern about the potential impact on wildlife and its habitat through the removal of vegetation.  As stated in the EA, Columbia's proposal will minimize impacts on these resources by collocating approximately 86 percent of the project along the existing Line 1570.  Columbia has also adopted the FERC *Upland Erosion Control, Revegetation, and Maintenance Plan* and *Wetland and Waterbody Construction and Mitigation Procedures* into its project-specific Environmental Construction Standards (ECS).  Columbia's ECS also includes a Spill Prevention, Containment, and Countermeasure Plan (SPCC Plan).  The ECS and SPCC Plan are described in the EA and were reviewed by our staff.

40.     Our staff also consulted with the U.S. Fish and Wildlife Service (FWS) as required under section 7 of the Endangered Species Act (ESA),[36] and it was determined that the project is not likely to adversely affect the Indiana bat.  Concurrence from the FWS was received via letter dated July 10, 2013.  No further ESA consultation is required.[37]  The EA concludes that impacts through the removal of vegetation along the proposed pipeline replacement will not significantly impact wildlife and its habitat.[38]

41.     Arthur M. Wilson expressed concern regarding the potential impact on cultural resources as the pipeline crosses through a meadow believed to be the site of past Native American activity.  As outlined in the EA, Columbia completed cultural resources surveys and provided the resulting reports to FERC staff and to the Pennsylvania State Historic Preservation Office (SHPO).  Columbia also provided an Unanticipated Discovery Plan which both our staff and the SHPO reviewed, requested minor revisions, and then found acceptable.[39]  The EA and SHPO concluded that the project would not affect historic properties.

---

[35] EA at 7.

[36] 16 U.S.C. § 1536 (2012).

[37] EA at 31.

[38] EA at 26.

[39] EA at 39.

### 1.   Cumulative Impacts

42.   In its scoping comments, the CAC states that cumulative impacts of the project should be considered with respect to natural gas production and greenhouse gas. emissions (GHG) known to contribute to climate change.  The CAC further commented that all direct and indirect impacts of the project should be considered, including impacts of existing and reasonably foreseeable Marcellus Shale gas development on air quality and climate change.

43.   The EA addresses cumulative impacts, including Marcellus Shale activities in the vicinity of the Line 1570 Project and GHGs, and concluded that due to the limited scope and impacts of the project, air quality was the only resource that could potentially be cumulatively affected.

44.   The project's associated operating emissions would not exceed the National Ambient Air Quality Standards and will be mitigated by federal, state, and local permits and approvals.  Moreover, the EA states that in August 2013, the Pennsylvania Department of Environmental Protection (PADEP) finalized air quality permitting criteria for unconventional gas well sites, which would mitigate air emissions from Marcellus Shale drilling/operating activities.[40]  Thus, we do not find that the project will contribute to a cumulative impact on regional air quality as a result of its operation.[41]

45.   The EA quantified the potential GHG emissions from the project's stationary, fugitive, and construction sources.  The potential increase in GHG emissions from operation of the stationary source (i.e., the Waynesburg Compressor Station) is anticipated to be a total of 68,185 tons per year of $CO_{2e}$ under conservative projections and 42,997 tons per year under ideal case projections;[42] construction would emit 2,564 tons of $CO_{2e}$.[43]  By way of comparison, the U.S. Environmental Protection Agency's (EPA) threshold for permitting is 100,000 tons per year of $CO_{2e}$ from a single stationary source (excluding construction-related emissions).[44]  Emissions from none of the proposed stationary sources exceed that level.  Further, under EPA's GHG reporting program, Columbia will be required to report the GHG emissions when actual emissions

---

[40] EA at 54.

[41] EA at 54.

[42] EA at 45 and 46.

[43] EA at 45.

[44] *See* 40 C.F.R. § 52.21(b)(49)(v) (2013).

exceed 25,000 tons $CO_{2e}$ per year from any stationary source.[45]  Regarding cumulative emissions of non-GHG pollutants, the EA identified other emission sources and concluded that there will be no significant cumulative impacts.[46]

## 2.    <u>Segmenting Projects</u>

46.    The CAC comments that Columbia's Line 1570 Project and Smithfield III Expansion Project should be considered together and urges the Commission to consider whether Columbia has improperly segmented the two projects to avoid comprehensive environmental review.

47.    Improper segmentation of a project occurs when interrelated projects are artificially divided into smaller, less significant components in order to avoid the NEPA requirement that an EIS be prepared for all major federal actions with significant environmental impacts.[47]  To determine whether a proposal has been improperly segmented, courts have considered such facts as whether the proposed segment (1) has logical termini; (2) has substantial independent utility; (3) does not foreclose the opportunity to consider alternatives; and (4) does not irretrievably commit federal funds for closely related projects.[48]  The Council of Environmental Quality's (CEQ) NEPA regulations provide guidance on when actions should be analyzed together or separately. Specifically, CEQ's regulations provide that proposals should be analyzed in the same EIS if they are "connected" (i.e., "closely related").[49]  Actions are connected if they

---

[45] *See id.* § 98.231.

[46] EA at 51 and 52.  To the extent the CAC's scoping comments suggest that the Commission must conduct a more expansive analysis of any impacts associated with natural gas development, we disagree.  We conclude that there are too many uncertainties about specific Marcellus Shale development and its environmental impacts to provide any meaningful consideration in a cumulative impact analysis.  *See Central New York Oil and Gas Company,* 137 FERC ¶ 61,121 (2011), *order on rehearing,* 138 FERC ¶ 61,104 (2012) and *Transcontinental Gas Pipe Line Company,* 145 FERC ¶ 61,152 at P 45 (2013).  Given the limited scope of Columbia's Line 1570 project, the largest portion of which is being constructed to enhance/maintain service to existing customers and which will impose limited direct or indirect impacts, we find that the EA's cumulative impact assessment is appropriate.

[47] *See Taxpayers Watchdog, Inc. v. Stanley,* 819 F.2d 294,298 (1987).

[48] *See Jackson County, N.C. v. FERC,* 589 F.3d 1284, 1290 (D.C. Cir. 2009); *O'Reilly v. U.S. Army Corps of Engineers,* 277 F.3d 225, 236 (5th Cir. 2007).

[49] 40 C.F.R. § 1508.25(a)(1)(iii) (2013).

automatically trigger other actions that may require an EIS, cannot or will not proceed unless other actions are taken previously or simultaneously, or are interdependent of a larger action and depend on the larger action for their justification.[50]

48.     Here, it is apparent that the Line 1570 Project and Smithfield III Expansion Project have substantial independent utility. As explained in this order, the purpose of the Line 1570 Project is to modernize Columbia's existing infrastructure in order to improve its reliability and to provide 99,000 Dth per day of additional natural gas transportation service to Columbia's existing Waynesburg Compressor Station in Greene County, Pennsylvania. The purpose of the Smithfield III Expansion Project is to enlarge Columbia's mainline capacity in order to provide firm transportation service for 444,000 Dth/day of natural gas, 94 percent of which transportation service has been subscribed by three new shippers to an interconnection with Columbia Gulf's system in Leach County, Kentucky. Neither project shares similar shippers. Neither project triggers another action nor are they dependent on a larger action; therefore, they are not connected. We find that the two projects were not improperly segmented.

49.     Moreover, the EA includes resource impact information for the Smithfield III Expansion Project and considered the impacts of that Project on the Line 1570 Project in the cumulative impacts section.[51] Impacts were determined to be minor. We find that the EA complies with NEPA requirements and CEQ's NEPA guidance.

### 3.     Whether an EIS is Appropriate for the Project

50.     The CAC believes the preparation of an EIS, rather than an EA, is necessary in order to consider the direct, indirect, and cumulative impacts associated with the Line 1570 Project. The CEQ regulations implementing NEPA state that one of the purposes of an EA is to assist agencies in determining whether to prepare an EIS or a finding of no significant impact.[52] Consistent with CEQ's regulations, the Commission's policy is to prepare an EA, rather than an EIS, if our initial review indicates that a project is not likely to be a major federal action significantly affecting the quality of the human environment. The Commission's NEPA regulations require preparation of an EIS for a "major pipeline construction project."[53] Our regulations do not define or explain what constitutes a "major" pipeline construction project. However, the Commission's years of

---

[50] *See id.* § 1508.25(a)(1).

[51] EA at 51 to 56.

[52] *See* 40 C.F.R. § 1508.9 (2013).

[53] *See* 18 C.F.R. § 380.6(a)(3) (2013).

experience with NEPA implementation for natural gas projects indicate that construction and operation of approximately 18.5 miles of 24-inch-diameter replacement pipeline, and modifications and addition of horsepower at an existing compressor station, would not fall under the "major" category for which an EIS is automatically prepared.  As indicated in the EA, no significant impacts will occur as a result of the construction, abandonment, and operation of this project.[54]  We affirm the EA's findings and reject the CAC's assertion than an EIS is required.

## 4.   Air Quality Application Deficiencies

51.    The CAC believes that Columbia's Waynesburg Compressor Station and Redd Farm Compressor Station (proposed in Columbia's Smithfield III Expansion Project) should be considered a single source facility for New Source Review and Title V air permitting, which would trigger major source reviews.  The EA explains that the PADEP is responsible for permitting the Waynesburg and Redd Farm Compressor Stations, including identifying whether these sources should be considered a single source and determining applicability to the New Source Review and Title V programs.[55]  Columbia applied for the air permits with the PADEP in May and August 2013, respectively.  A response from PADEP is expected in April 2014.

## 5.   Air Quality Modeling

52.    The CAC contends that Columbia should be required to perform dispersion modeling to properly assess air quality impacts of the Line 1570 Project.[56]  The CAC further comments that additional pollution control technologies should be considered, including selective catalytic reduction and potential replacement and retrofits that mitigate degradation to air quality.

---

[54] EA at 62.

[55] EA at 42.

[56] The CAC also referenced an air model that it conducted for the Barto Compressor Station, which alleged that nitrogen dioxide emissions from the station exceeded National Ambient Air Quality Standards (NAAQS).  The PADEP, which is responsible for monitoring air quality within the state to ensure compliance with the Clean Air Act, concluded that it did not detect any nitrogen dioxide measurements greater than NAAQS and stated that it would continue to monitor the impacts of the Marcellus Shale development activities on air quality.  The response of Columbia to comments of the CAC was filed on September 5, 2013.

53.     As stated in the EA, Columbia conducted a quantitative assessment of project air emissions using air dispersion modeling through the screening function of the EPA's AERMOD.  The EA identifies the modeling results for the Waynesburg Compressor Station in comparison with National Ambient Air Quality Standards (NAAQS).  The results, as outlined in the EA, demonstrate that emissions from the Waynesburg Compressor Station following completion of the project are below NAAQS, and operations will not result in regionally significant impacts on air quality.[57]

## 6.     Alternatives Analysis and Recommendations

54.     The CAC suggests that the Commission consider alternatives to the proposed action, mentioning renewable energy sources including solar, offshore wind, and energy conservation and efficiency measures.  Renewable energy sources relate to energy generation usage and have no relation to the transport of natural gas.  The EA concludes that suggested alternatives would not meet the project objectives (i.e. to modernize Line 1570 and to create pipeline capacity to provide up to 99,000 Dth per day of firm transportation service).

55.     The CAC further comments that additional pollution control technologies should be considered, including selective catalytic reduction and potential replacement and retrofits that mitigate degradation to air quality.  We confirm here that Columbia's Waynesburg Compressor Station modification incorporates emission reduction technology.  Further, Environmental Condition 8 in Appendix A to this order requires Columbia to file documentation that it has received all necessary authorizations required under federal law, which will include the required PADEP air permit.  As stated in the EA, Columbia must demonstrate to the state agency that emissions from the Waynesburg Compressor Station will not exceed acceptable levels, and Columbia must obtain the requisite air quality permit.[58]  The PADEP is responsible for enforcing the federally authorized state implementation plan to comply with air quality standards according to the Clean Air Act.  Columbia's compliance with the permitting process ensures minimization of air quality impacts.  Thus, the EA concludes that analyses of additional emission control technology alternatives are not warranted.[59]  We concur.

56.     The CAC further requests consideration of a new electric-driven compressor unit as an alternative to the new gas-fired turbine unit at the Waynesburg Compressor Station.  The Waynesburg Compressor Station is an existing smaller sized natural-gas

---

[57] EA at 47 to 48.

[58] EA at 60 to 61.

[59] EA at 61.

Docket No. CP13-478-000                                    - 18 -

fired compressor station with a total of 5,400 hp, and the new 4,700 hp natural gas-fired turbine proposed for the facility will replace three existing natural gas-fired turbine units (totaling 3,240 hp). As stated in the EA, the installation of a new, efficient compressor unit will allow Columbia operational flexibility, as all five existing compressor units would remain in service at the station; however, Columbia will only operate up to two existing units at the same time as the new Centaur unit. Under Columbia's operating conditions analyzed in the EA, the facility continues to remain a minor source with respect to the air permitting requirements. The EA concludes that the modifications will not result in significant additional emissions at the facility to warrant the consideration of introducing an electric-driven unit, the addition of a potential electric substation to provide power, and any needed additional power lines and land disturbance.

57.    Based on the analysis in the EA, we conclude that if constructed and operated in accordance with Columbia's application and supplements, and in compliance with the environmental conditions in Appendix A to this order, our approval of this proposal will not constitute a major federal action significantly affecting the quality of the human environment.

58.    Any state or local permits issued with respect to the jurisdictional facilities authorized herein must be consistent with the conditions of this certificate. The Commission encourages cooperation between interstate pipelines and local authorities. However, this does not mean that state and local agencies, through application of state or local laws, may prohibit or unreasonably delay the construction or operation of facilities approved by this Commission.[60]

59.    The Commission on its own motion received and made a part of the record in this proceeding all evidence, including the application(s), as supplemented, and exhibits thereto, submitted in support of the authorizations sought herein, and upon consideration of the record,

<u>The Commission orders</u>:

    (A)    A certificate of public convenience and necessity is issued authorizing Columbia to construct and operate the Line 1570 Project, as described more fully in this order and in the application.

---

[60] *See, e.g., Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293 (1988); *National Fuel Gas Supply v. Public Service Commission*, 894 F.2d 571 (2d Cir. 1990); and *Iroquois Gas Transmission System, L.P., et al.*, 52 FERC ¶ 61,091 (1990) and 59 FERC ¶ 61,094 (1992).

Docket No. CP13-478-000                                              - 19 -

    (B)    The certificate issued in Ordering Paragraph (A) is conditioned on:

        (1)    Columbia's completing the authorized construction of the proposed facilities and making them available for service within two years of the date of this order pursuant to section 157.20(b) of the Commission's regulations;

        (2)    Columbia's compliance with all applicable Commission regulations, including paragraphs (a), (c), (e), and (f) of section 157.20 of the Commission's regulations;

        (3)    Columbia's compliance with the environmental conditions listed in Appendix A to this order.

    (C)    Columbia's proposed initial rates are approved.

    (D)    Columbia's request for a predetermination for rolled-in rate treatment for the costs of the Line 1570 Project in its next general NGA section 4 rate proceeding is granted, barring a significant change in circumstances, as discussed in the body of this order.

    (E)    Columbia must file not less than 30 days, or more than 60 days, before the in-service date of the proposed facilities, all negotiated rate agreements or a tariff record describing the negotiated rate agreements associated with this project.

    (F)    Columbia shall notify the Commission's environmental staff by telephone, electronic mail, and/or facsimile of any environmental noncompliance identified by other federal, state, or local agencies on the same day that such agency notifies Columbia. Columbia shall file written confirmation of such notification with the Secretary of the Commission within 24 hours.

By the Commission.

( S E A L )


                                                Nathaniel J. Davis, Sr.,
                                                Deputy Secretary.

Docket No. CP13-478-000                                      - 20 -

## Appendix A

As recommended in the environmental assessment (EA), this authorization includes the following conditions:

1.    Columbia shall follow the construction procedures and mitigation measures described in its application, supplements (including responses to staff data requests) and as identified in the EA, unless modified by this order.  Columbia must:

      a.    request any modification to these procedures, measures, or conditions in a filing with the Secretary of the Commission (Secretary);
      b.    justify each modification relative to site-specific conditions;
      c.    explain how that modification provides an equal or greater level of environmental protection than the original measure; and
      d.    receive approval in writing from the Director of Office of Energy Projects (OEP) before using that modification.

2.    The Director of OEP has delegated authority to take whatever steps are necessary to ensure the protection of all environmental resources during construction and operation of the project.  This authority shall allow:

      a.    the modification of conditions of this order; and
      b.    the design and implementation of any additional measures deemed necessary (including stop-work authority) to assure continued compliance with the intent of the environmental conditions as well as the avoidance or mitigation of adverse environmental impact resulting from project construction, operation, and abandonment.

3.    **Prior to any construction**, Columbia shall file an affirmative statement with the Secretary, certified by a senior company official, that all company personnel, environmental inspectors (EIs), and contractor personnel will be informed of the EI's authority and have been or will be trained on the implementation of the environmental mitigation measures appropriate to their jobs **before** becoming involved with construction and restoration activities.

4.    The authorized facility locations shall be as shown in the EA.  **As soon as they are available, and before the start of construction**, Columbia shall file with the Secretary any revised detailed survey alignment maps/sheets at a scale not smaller than 1:6,000 with station positions for all facilities approved by this order.  All requests for modifications of environmental conditions of this order or site-

specific clearances must be written and must reference locations designated on these alignment maps/sheets.

Columbia's exercise of eminent domain authority granted under Natural Gas Act section 7(h) in any condemnation proceedings related to this order must be consistent with these authorized facilities and locations. Columbia's right of eminent domain granted under Natural Gas Act section 7(h) does not authorize it to increase the size of its natural gas pipeline to accommodate future needs or to acquire a right-of-way for a pipeline to transport a commodity other than natural gas.

5.      Columbia shall file with the Secretary detailed alignment maps/sheets and aerial photographs at a scale not smaller than 1:6,000 identifying all route realignments or facility relocations, and staging areas, pipe storage yards, new access roads, and other areas that would be used or disturbed and have not been previously identified in filings with the Secretary. Approval for each of these areas must be explicitly requested in writing. For each area, the request must include a description of the existing land use/cover type, documentation of landowner approval, whether any cultural resources or federally listed threatened or endangered species would be affected, and whether any other environmentally sensitive areas are within or abutting the area. All areas shall be clearly identified on the maps/sheets/aerial photographs. Each area must be approved in writing by the Director of OEP **before construction in or near that area.**

This requirement does not apply to extra workspace allowed by FERC's *Upland Erosion Control Revegetation Maintenance Plan* and/or minor field realignments per landowner needs and requirements which do not affect other landowners or sensitive environmental areas such as wetlands.

Examples of alterations requiring approval include all route realignments and facility location changes resulting from:

a.      implementation of cultural resources mitigation measures;
b.      implementation of endangered, threatened, or special concern species mitigation measures;
c.      recommendations by state regulatory authorities; and
d.      agreements with individual landowners that affect other landowners or could affect sensitive environmental areas.

6.      **Within 60 days of the acceptance of the Certificate and before construction begins,** Columbia shall file an Implementation Plan with the Secretary for review and written approval by the Director of OEP. Columbia must file revisions to the plan as schedules change. The plan shall identify:

    a.    how Columbia will implement the construction procedures and mitigation measures described in its application and supplements (including responses to staff data requests), identified in the EA, and required by this order;

    b.    how Columbia will incorporate these requirements into the contract bid documents, construction contracts (especially penalty clauses and specifications), and construction drawings so that the mitigation required at each site is clear to onsite construction and inspection personnel;

    c.    the number of EIs assigned, and how the company will ensure that sufficient personnel are available to implement the environmental mitigation;

    d.    company personnel, including EIs and contractors, who will receive copies of the appropriate material;

    e.    the location and dates of the environmental compliance training and instructions Columbia will give to all personnel involved with construction and restoration (initial and refresher training as the project progresses and personnel change).

    f.    the company personnel (if known) and specific portion of Columbia's organization having responsibility for compliance;

    g.    the procedures (including use of contract penalties) Columbia will follow if noncompliance occurs; and

    h.    for each discrete facility, a Gantt or PERT chart (or similar project scheduling diagram), and dates for:

        (1)    the completion of all required surveys and reports;
        (2)    the environmental compliance training of onsite personnel;
        (3)    the start of construction; and
        (4)    the start and completion of restoration.

7.    Beginning with the filing of its Implementation Plan, Columbia shall file updated status reports with the Secretary **on a biweekly basis until all construction and restoration activities are complete**. On request, these status reports will also be provided to other federal and state agencies with permitting responsibilities. Status reports shall include:

    a.    an update on Columbia's efforts to obtain the necessary federal authorizations;

    b.    the construction status of the project, work planned for the following reporting period, and any schedule changes for stream crossings or work in other environmentally sensitive areas;

    c.    a listing of all problems encountered and each instance of noncompliance observed by the EI during the reporting period (both for the conditions

imposed by the Commission and any environmental conditions/permit requirements imposed by other federal, state, or local agencies);

d.   a description of the corrective actions implemented in response to all instances of noncompliance, and their cost;

e.   the effectiveness of all corrective actions implemented;

f.   a description of any landowner/resident complaints which may relate to compliance with the requirements of this order, and the measures taken to satisfy their concerns; and

g.   copies of any correspondence received by Columbia from other federal, state, or local permitting agencies concerning instances of noncompliance, and Columbia's response.

8.   **Prior to receiving written authorization from the Director of OEP to commence construction of any project facilities**, Columbia shall file with the Secretary documentation that it has received all applicable authorizations required under federal law (or evidence of waiver thereof).

9.   Columbia must receive written authorization from the Director of OEP **before placing the project into service.** Such authorization will only be granted following a determination that rehabilitation and restoration of the right-of-way and other areas affected by the project are proceeding satisfactorily.

10.  **Within 30 days of placing the authorized facilities in service,** Columbia shall file an affirmative statement with the Secretary, certified by a senior company official:

a.   that the facilities have been constructed in compliance with all applicable conditions, and that continuing activities will be consistent with all applicable conditions; or

b.   identifying which of the Certificate conditions Columbia has complied with or will comply with. This statement shall also identify any areas affected by the project where compliance measures were not properly implemented, if not previously identified in filed status reports, and the reason for noncompliance.

11.  **Prior to construction,** Columbia shall file a Fugitive Dust Control Plan with the Secretary, for review and written approval of the Director of OEP. The plan must specify the following:

a.   the precautions that Columbia will take to minimize fugitive dust emissions from construction activities, including additional mitigation measures to control fugitive dust emissions of Total Suspended Particulates and

particulate matter with an aerodynamic diameter less than or equal to 10 microns, such as:

    (i)    watering the construction workspace and access roads;

    (ii)   measures to limit track-out onto the roads;

    (iii)  the speed limit that Columbia would enforce on unsurfaced roads; and

    (iv)  covering open-bodied haul trucks, as appropriate;

  b.    the individuals with the authority to determine if/when water needs to be reapplied for dust control;

  c.    the individuals with the authority to determine if/when a palliative needs to be used; and

  d.    the individuals with the authority to stop work if the contractor does not comply with dust control measures.

12.    Columbia shall file a noise survey with the Secretary **no later than 60 days** after placing the modified Waynesburg Compressor Station in service. If a full load condition noise survey is not possible, Columbia shall file an interim survey at the maximum possible horsepower load and file the full load survey **within 6 months**. Columbia shall make all reasonable efforts to ensure its predicted noise levels from operation of the new compressor unit and any two existing compressor units at the modified Waynesburg Compressor Station are not exceeded at any nearby noise sensitive areas (NSAs). In addition, if operation of the new compressor unit at full or interim horsepower load conditions exceeds a day-night average sound level of 55 decibels at any nearby NSAs, Columbia shall file a report on what changes are needed and should install the additional noise controls to meet the level **within 1 year** of the in-service date. Columbia shall confirm compliance with the above requirements by filing a second noise survey with the Secretary **no later than 60 days** after it installs the additional noise controls.

Docket No. CP13-478-000                                                    - 26 -

## **Appendix B**

### **Timely Intervenors**

Antero Resources Appalachian Corporation
Arthur M. and Beverly F. Wilson
Atmos Energy Marketing LLC
BP Energy Company
Chevron U.S.A. Inc.
City of Charlottesville, Virginia
City of Richmond, Virginia
Columbia Gas of Kentucky, Inc., Columbia Gas of Maryland, Inc., Columbia Gas of
Ohio, Inc., Columbia Gas of Pennsylvania, Inc., and Columbia Gas of Virginia, Inc.
(together known as NiSource Distribution Companies)
ConocoPhillips Company
Exelon Corporation
Hess Corporation
Interstate Gas Supply, Inc.
National Fuel Gas Distribution Corporation
National Grid Gas Delivery Companies
New Jersey Natural Gas Company
NJR Energy Services Company
Noble Energy, Inc.
Orange and Rockland Utilities, Inc.
Statoil Natural Gas LLC
PSEG Energy Resources & Trade LLC
Piedmont Natural Gas Company, Inc.
UGI Utilities, Inc., UGI Penn Natural Gas, Inc., and UGI Central Penn Gas, Inc. (together
known as UGI Distribution Companies)
Virginia Natural Gas, Inc.
Washington Gas Light Company

# EXHIBIT 4

Subject: Re: Tri-County Line 1570 Resource Report
To: kgblx@live.com
From: r.hansen@thenlsgroup.com
CC: j.garner@thenlsgroup.com
Date: Tue, 5 Apr 2016 19:33:36 -0400

Good evening, Mike--

I am sorry we have not been able to progress past the issue of the farm tap. Jonny and I would both like to work with you on the other points on the project but, if the tap is a stopper for you, I can only say that Columbia is removing all taps from transmission lines (as is the industry as a whole) and is not making concessions on this point now that Columbia Pipeline Group (us) and Columbia Gas of PA (the company that meters and bills you for your gas) are no longer under one umbrella.

I'd like to keep the conversation going but understand your position. Please let me know what information Jonny and I can provide to help work through to the next steps.

In the meantime, please see our email chain below for the information you requested regarding the pressurization and odorization of the line.

Thank you for your time tonight.

Ryan

Ryan Hansen
Right of Way Manager
The NLS Group
in Service to Columbia Pipeline Group
55 South Main Street
Washington, PA 15301
Mobile:  (603) 491-6925
Office:   (724) 222-2813
Fax:      (724) 222-2815

RECEIVED

2017 SEP 15 PM 1:20

DAUPHIN COUNTY
SHERIFF'S OFFICE
HARRISBURG, PA 17101



A TRUE COPY
ATTEST:

SAMUEL F. ROMANO
SHERIFF